UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EDWARD JONES,                            **No. 05-CV-0886(VEB)**
               Petitioner,        **DECISION AND ORDER**

     -vs-

THOMAS L. POOLE,
               Respondent,
_____

## I.      Introduction

*Pro se* petitioner Edward Jones ("Jones" or "Petitioner") has filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state-custody resulting from a

judgment against him entered in New York State Supreme Court (Monroe County, Fisher. J.), on

February 7, 2001, following a jury trial convicting him Assault in the First Degree (New York

Penal Law ("P.L.") § 120.10(3)), Aggravated Unlicensed Operation of a Motor Vehicle in the

Second Degree (Vehicle and Traffic Law ("VTL") § 511(2)(iv)), and Operation of a Motor

Vehicle without a License (VTL § 509(1)). Jones was sentenced as a second violent felony

offender to an aggregate determinate term of 18 years imprisonment and is currently serving this

sentence.

The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1). For the reasons that follow, Jones' request for a writ of habeas corpus is

denied and the Petition is dismissed.

## II.     Factual Background

While investigating the theft of fifteen-year-old Tyrone Bennett's ("Bennett's) coat on the

morning of January 18, 2000, Rochester Police Officer Scott McLaughlin ("Officer McLaughlin") was speaking to an individual at the corner of Main Street and Clinton Avenue in the City of Rochester with his back facing traffic when he was struck from behind by a vehicle driven by Petitioner. The force of the impact first catapulted McLaughlin onto the hood and windshield of the Cadillac and then propelled him into a stone sidewalk-planter, while the Cadillac crashed into McLaughlin's police vehicle. T.286.[1] The Cadillac pushed the police car 20 to 25 feet before it collided with a second police car; the conglomeration of the three cars continued moving for another 20 feet. T.652-53.

According to the medical testimony, Officer McLaughlin sustained devastating injuries–namely, a severe brain injury and multiple fractures to his lower extremities, which necessitated further surgery to replace part of his skull during the rehabilitation process. T.293.

Petitioner emerged from the crash relatively unscathed. Although he told the emergency room doctor that he had some pain in his shin, the examination revealed that Petitioner had sustained no injuries. T.782-83. Petitioner was treated for an epileptic seizure and released from the hospital several hours later.

Petitioner's medical records revealed a history of 6 epileptic seizures during the previous 8 months– (May 25th (T.638), June 14th (T.592), July 24th (T.628), September 14th (T.579-81), September 29th (T.615), and November 11th (T.604)–all of which necessitated medical intervention. Just three days prior to the collision with Officer McLaughlin, Petitioner had arrived by ambulance at the emergency room after suffering yet another seizure. T.604-665. On that occasion, Jones informed the doctor that he had missed a couple of doses of Dilantin and

---

[1]     Citations to "T.__" refer to pages in the transcript of Jones' trial.

Phenobarbital, the medicines prescribed to control his seizures. T. 671. Upon being discharged, Petitioner was informed that his seizure was due to his failure to take his medication as prescribed. Dr. Sato told Jones that his seizure "was most likely secondary to subtherapeutic Dilantin levels, that he wasn't taking his Dilantin regularly. T.678, 689. Dr. Sato testified that he told Jones that as a doctor it was his responsibility to tell him that he should not drive until he remained seizure-free for at least a year. T.680-81, 682, 698. According to Dr. Sato, Petitioner "looked at [him] in kind of shock, shook his head and looked like – he gave me the look, that ["]what-am-I-supposed-to-do["] kind of look. T.681, 695. Dr. Sato did not recall Jones giving a verbal response. *Id.* Dr. Sato spoke with Jones' physician, Dr. Saha. T.685. Upon discharge, Dr. Sato increased his Dilantin levels to 200 mg twice a day. T.701-03. Previously Jones had been instructed to take 100 mg three times a day. T.702, 712. Therapeutically, he could attain the same levels by taking all of the medication at once; however, it was not the proper way to take the medication insofar as it increased the risk of side effects (hypotension). T.712.

Investigator Reinstein testified that, during the criminal investigation, Jones explained that three things that primarily brought on the seizures–lack of sleep, stress, and not having appropriate levels of medication. T.514. Jones confirmed that he had received enough sleep and was not under stress. *Id.* When asked if he was taking the proper levels of medication, "he just smiled and made no oral response." T.514-15. Jones said that his brother had told him that he (Jones) had experienced a seizure the previous night while was sleeping. T.515. Jones thus knew on the morning of the collision that he had had a seizure the night before. When asked about alternative means of transportation, Jones said he did not consider asking his brother for a ride or taking a cab because he "felt fine." T.516. He acknowledged that his licence had been suspended

and that he tried to straighten it out in 1999 but could not. He did not elaborate further. Jones said that he was advised by his doctor "that he shouldn't be driving until he was seizure free for at least a year." T.520. Jones said that the last time he had been seizure-free was in 1995-1996 timeframe; the seizures began again in 1997. T.520.

Petitioner acknowledged that he had received this warning from the doctor regarding not driving, and he knew that he needed to take his prescription medication to prevent seizures. On the date of the collision, Petitioner made conflicting statements to the authorities about whether he had last taken his full dosage of medication the morning of the day before the collision, or whether he had taken it at all. T.382, 788.

The jury received instructions to consider the charge of Assault in the First Degree and the lesser-included offense of Assault in the Third Degree. T.982-986. The jury was also instructed with regard to Aggravated Unlicensed Operation of a Motor Vehicle in the Second Degree and Operation of a Motor Vehicle without a license. During deliberations, the jury requested that the court review the elements of Assault in the First Degree and Assault in the Third Degree. T.997. The jury sent a second note requesting the difference between depraved indifference and recklessness. T.007-08.

The jury returned a verdict convicting Petitioner of Assault in the First Degree (Penal Law § 120.10 (3)) for recklessly causing Officer McLaughlin's injuries under circumstances evincing a depraved indifference to human life. The jury rejected the lesser included offenses submitted to them for consideration. The jury also convicted on the two V.T.L. charges in the indictment (Aggravated Unlicensed Operation in the Second Degree and Unlicensed Operation). TM 161.

Jones was sentenced, as a second violent-felony offender, to a determinate term of 18

years in prison. The Appellate Division, Fourth Department, unanimously affirmed his

conviction by decision entered October 1, 2004. *People v. Jones*, 11 A.D.3d 902 (N.Y. App. Div.

4th Dept. 2004). The New York Court of Appeals denied Petitioner's motion for leave to appeal

on November 29, 2004. *People v. Jones*, 3 N.Y.3d 757 (N.Y. 2004).

This timely habeas petition followed.

## III. General Legal Principles Applicable on Habeas Review of § 2254 Petitions

### A. Standard of Review

Only federal issues may be raised on habeas review. *See* 28 U.S.C. § 2254(a); *Estelle v.*

*McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Pursuant to the Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA"), when a federal claim has been

"adjudicated on the merits" by a state court, the state court's judgment is entitled to substantial

deference. *See Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001); 28 U.S.C. § 2254(d). "[A]

state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the

claim on the merits, and (2) reduces its disposition to judgment." (citations and quotations

omitted). *Sellan*, 261 F.3d at 312.

For claims "adjudicated on the merits," habeas relief may not be granted unless the state

court "decision" (1) was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or (2) was

"based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As the Supreme Court recently reiterated,

the phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of

[the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, ___ U.S.___, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quotation marks omitted)).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. 1495. A state court decision involves an "unreasonable application" of clearly established federal law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *Id.* at 409, 120 S.Ct. 1495. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application, in the reviewing court's opinion, was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir.2003) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000) (quotation marks omitted)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003) (quoting *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (quotation marks omitted)).

**B.    The "Adequate and Independent State Ground" Doctrine and Procedural Default**

Ordinarily, federal courts may not review state court decisions that rest on an adequate

and independent state procedural ground unless the petitioner can show both cause and prejudice or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see Lee v. Kemna*, 534 U.S. 362, 122 S.Ct. 877, 885, 888, 151 L.Ed.2d 820 (2002) (noting the existence of a "small category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question") (citation omitted)). A federal habeas court may not review a claim if a state court decision contains a plain statement that the claim is procedurally barred, even if the state court also reaches the merits of the claim in an alternative holding. *Harris v. Reed*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (holding that). "In all cases in which a state prisoner has defaulted his federal [claim] in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the [claim] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

To demonstrate cause for a procedural default, a petitioner must identify "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule ." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In addition to cause, a petitioner must demonstrate prejudice by showing that the errors worked to the petitioner's "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Alternatively, a habeas petitioner may "bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage

of justice, i.e., that he is actually innocent of the crime for which he has been convicted."

*Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir.2002); *see also Murray*, 477 U.S. at 496; *Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

## IV. Discussion

### A. Prosecutorial Misconduct

Petitioner challenges the propriety of the trial prosecutor's statement during *voir dire* that "My job is to present evidence to you and to convince you of the Defendant's guilt beyond a reasonable doubt". On direct appeal, the prosecutor argued that Petitioner failed to object to the comment and therefore the issue was not preserved for appellate review. The Appellate Division agreed. *People v. Jones*, 11 A.D.3d 902, 903, 2004 N.Y. Slip Op. 06872 (App. Div. 4th Dept. 2004) ("We conclude that defendant's challenge to the prosecutor's remark is unpreserved for our review and without merit in any event. The record establishes that the remark, considered in its context, was intended to explain the prosecutor's role in the proceedings for the benefit of the prospective jurors, not to express the prosecutor's belief in defendant's guilt.")

Respondent correctly asserts that the issue was decided upon the independent and adequate state ground of non-preservation. The fact that the Appellate Division did rule on the merits in the alternative does not remove the independent and adequate state ground bar. *Harris v. Reed*, 489 U.S. at 264 n.10.

Petitioner may establish cause by showing " 'that the factual or legal basis for a claim was not reasonably available to counsel,' or that some interference by officials made compliance impracticable." *McCleskey v. Zant*, 499 U.S. 467, 493-94, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1991)).

To satisfy the prejudice requirement, the alleged error must have worked to the petitioner's actual and substantial disadvantage. *See Amadeo v. Zant*, 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). If the petitioner cannot show cause and prejudice, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim. A fundamental miscarriage of justice requires a showing "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner [guilty]." *Sawyer v. Whitley*, 505 U.S. 333, 335, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

Jones fails to establish cause for his procedural default, or prejudice resulting therefrom. Furthermore, he has not made a demonstration of "actual innocence" so as to convince the Court that a fundamental miscarriage of justice will result if I decline to entertain the procedural misconduct claim. Therefore, Ground One of the Petition must be dismissed as procedurally defaulted.

### B.    Trial Court Error – Failure to Excuse a Juror for Cause

As his second ground for relief, Jones argues that the trial court erred in failing to excuse a juror whom defense counsel challenged for cause. The trial court denied defense counsel's motion to excuse this potential juror "for cause." T.102-03. Defense counsel then utilized a preemptory challenge to excuse the juror. T.106. *See also* Petitioner's Appellate Brief at Point II. On direct appeal, the Appellate Division concluded that, due to trial counsel's "failure to exhaust all of his peremptory challenges before the completion of jury selection, [Petitioner] . . . failed to preserve [that contention] for . . . review." *People v. Jones*, 11 A.D.3d at 903. Respondent argues that the claim is procedurally defaulted as a result of the state court's dismissal of the claim based

upon an adequate and independent state procedural rule. *See People v. Simpson*, 292 AD2d 852 (App. Div. 4th Dept, 2002), lv denied 98 NY2d 655 ("Even assuming, arguendo, that the court erred in denying the challenge for cause, we conclude that reversal would not be warranted. "[E]rroneous denial of a challenge for cause 'does not constitute reversible error unless the defendant has exhausted his peremptory challenges at the time or, if he has not, he peremptorily challenges such prospective juror and his peremptory challenges are exhausted before the selection of the jury is complete' " (*People v Lynch*, 95 NY2d 243, 248 [(N.Y. 2000)], quoting New York Criminal Procedure Law ("C.P.L." 270.20(2)).

This Court is barred from exercising federal habeas review over Jones' challenge for cause claim by operation of C.P.L. § 270.20(2), an independent and adequate state law, which provides that an erroneous ruling by the court denying a challenge for cause does not constitute reversible error unless the defendant has exhausted his peremptory challenges at the time, or unless the defendant peremptorily challenges the prospective juror and exhausts his peremptory challenges before jury selection is complete. *Accord, e.g., Burks v. McGinnis*, No. 01-CV-1240(JG), 2002 WL 31410242, at *3 (E.D.N.Y. Oct. 3, 2002) (" Here, both of Burks's claims are procedurally barred because the Appellate Division denied them on the basis of adequate and independent state grounds. It denied the first claim because he failed to exhaust his peremptory challenges, thereby rendering harmless any erroneous ruling by the trial court. N.Y. CRIM. PRO. LAW § 270.20(2) ("An erroneous ruling by the court denying a challenge for cause by the defendant does not constitute reversible error unless the defendant has exhausted his peremptory challenges at the time or, if he has not, he peremptorily challenges such prospective juror and his peremptory challenges are exhausted before the selection of the jury is complete.").

Jones has not made the requisite showing to overcome this state procedural bar. Jones has failed to demonstrate, or even allege, cause and prejudice, or show that failure to consider his claim would result in a fundamental miscarriage of justice. No credible evidence in the record suggests that Jones is actually innocent of the crimes for which he has been convicted. Thus, this Court is barred from exercising federal habeas review over this particular claim. In any event and in the alternative, the Court finds that Jones has not demonstrated that the trial court's refusal to dismiss the juror for cause denied him a right to an impartial jury or prejudiced him in any way. After all, petitioner cannot be said to have been prejudiced given that he used a peremptory strike to remove the juror he had challenged for cause, the allegedly partial juror ultimately did not sit on Petitioner's jury, and at the conclusion of jury selection he had peremptory challenges remaining. Ground Two of Jones' Petition does not warrant habeas relief and is dismissed.

**C.    Verdict Unsupported by Legally Sufficient Evidence and Against the Weight of the Credible Evidence**

**1.    Sufficiency of the Evidence**

Jones argues that his due process rights were violated because the evidence presented at trial was insufficient to sustain his conviction for depraved indifference assault.[2] On direct appeal, the Appellate Division denied this claim on the merits as follows:

> The evidence is legally sufficient and the verdict is not against the weight of the evidence with respect to the gravity of the risk presented by the fact that defendant, an epileptic, drove a motor vehicle after failing to take his prescribed medication, and with respect to defendant's awareness and disregard of that risk (*see* Penal Law § 15.05(3); § 120.10(3)).

---

[2]    New York Penal Law 120.10(3) states that "A person is guilty of assault in the first degree when . . . . (3)[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person . . . ." N.Y. Penal Law 120.10(3).

*People v. Jones*, 11 A.D.3d 902, 903, 782 N.Y.S.2d 322, 324 (internal case citations omitted).

The well-settled standard applied on appellate review of a claim challenging the legal sufficiency of the evidence is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord People v. Taylor*, 94 N.Y.2d 910, 911 (2000); *People v. Contes*, 60 N.Y.2d 620, 621 (1983). In *Jackson*, the Supreme Court explained,

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

443 U.S. at 326, 99 S.Ct. at 2793. Thus, "[w]hen reviewing a conviction for an alleged insufficiency of evidence, [Federal courts] will view the evidence 'in the light most favorable to the government, and constru[e] all permissible inferences in its favor,' . . . 'resolve all issues of credibility[ ] in favor of the jury's verdict' . . . and 'uphold a conviction if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.'" *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998); *see also Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994), *cert. denied*, 514 U.S. 1066 (1995). "In making this determination," the court does "not engage in piecemeal review, but rather, [it] review[s] the evidence as a whole." *United States v. Khan*, 53 F.3d 507, 513 (2d Cir. 1995) (citations omitted); *accord, e.g.*, *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996).

The resolution of issues of credibility, which often is central to the adjudication of a habeas petitioner's challenge to the legal sufficiency of the evidence, belongs exclusively to the

jury, whose credibility determinations may not be overturned lightly. *See United States v. Shulman*, 624 F.2d 384, 388 (2d Cir.1980) ("Under our system of jurisprudence ... the resolution of issues of credibility is exclusively the province of the jury."). When a habeas corpus court confronts a trial record from which conflicting inferences may be drawn, it must presume, even if the record does not show it affirmatively, that the trier-of-fact resolved the conflict in favor of the prosecution and must defer to that resolution. *See Wright v. West*, 505 U.S. 277, 296-97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). The reviewing court's role is not to weigh the trial evidence but rather it is "required to defer to the jury's resolution of all questions as to the credibility of the witnesses, the inferences to be drawn, and the weight of the evidence." *United States v. Jacobo*, 934 F.2d 411, 415 (2d Cir.1991). Thus, the reviewing court must defer to the jury's decision to believe a witness's testimony. *See United States v. Khan*, 53 F.3d 507, 514 (2d Cir.1995) (stating that "the credibility of witnesses is the province of the jury and we simply cannot replace the jury's credibility determinations with our own"); *Maldonado v. Scully*, 86 F.3d at 35 (explaining that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; [court must] defer to the jury's assessments of both of these issues"). Thus, a "petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000); *see also Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 (2d Cir.1997); *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir.1993)).

"[W]hen a federal habeas court conducts AEDPA review of a state court's sufficiency ruling, it does not apply the *Winship* rule [as explicated in *Jackson*] by itself; it must first look to

state law to determine the facts necessary to constitute the charged crime, in short, the crime's

elements." *Policano v. Herbert*, 453 F.3d 79, 92 (2d Cir. 2006) (citing *Fama*, 235 F.3d at 811

(internal quotation marks omitted)). "It is well established that a federal habeas court may not

second-guess a state court's construction of its own law." *Policano*, 453 F.3d at 92 (citing *Estelle*

*v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. 475 ("[I]t is not the province of a federal habeas court

to reexamine state-court determinations on state-law questions."); *Mullaney v. Wilbur*, 421 U.S.

684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (holding that "state courts are the ultimate

expositors of state law"). To determine the essential elements of the crime, the habeas court must

look to state law. *Jackson*, 443 U.S. at 324 n. 16.

　　　　To prove a defendant guilty of Assault in the First Degree (i.e., depraved indifference

assault) under New York law, the prosecution needs to establish three elements: (1) reckless

conduct creating a grave risk of death, (2) committed under circumstances which, objectively

viewed, evince a depraved indifference to human life, and (3) a resultant "serious physical

injury." N.Y. PENAL LAW § 120.10(3); *see also People v. Van Norstrand*, 85 N.Y.2d 131, 623

N.Y.S.2d 767 (1995) ("A person commits the . . . crime of first degree assault under Penal Law §

120.10(3) when "[u]nder circumstances evincing a depraved indifference to human life, he

recklessly engages in conduct which creates a grave risk of death . . . and thereby causes serious

physical injury").

　　　　As Petitioner explained on direct appeal, the sole element of the offense in question in

this case concerned his knowledge of the potential consequences of driving with epilepsy. In

other words, the key issues for the trier of fact to resolve were whether Jones engaged in conduct

which created a substantial, unjustifiable and grave risk that death to another person, whether he

was aware of and consciously disregarded that risk, and whether that risk was of such nature and degree that disregard of it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.  Petitioner argues that the evidence was insufficient to prove that he acted recklessly, and with depraved indifference to human life, when he conducted a motor vehicle, and underwent an epileptic seizure, thereby losing control of his car, which ran over Officer McLaughlin and caused him severe injuries. The prosecution argued that, given Petitioner's long history of seizures, and particularly the pointed warning he was given by doctors just days before the accident that he should not drive, the proof clearly established all of the elements of depraved indifference assault. In attempting to minimize the doctor's testimony warning Jones that he should not drive until he was seizure-free for one year, Jones' appellate counsel argued that the doctors did not advise him of the *specific* potential consequences of driving a motor vehicle while suffering from an unpredictably self-managed seizure disorder. Therefore, the defense argued, the prosecution failed to establish that Jones had *actual* knowledge of the possible consequences of operating a motor vehicle given his current medical status.

Importantly, Jones' conviction of depraved indifference assault predates *People v. Feingold*, 7 N.Y.3d 288, 294, 819 N.Y.S.2d 691, 852 N.E.2d 1163 (N.Y. 2006), in which the New York Court of Appeals reformulated of its view of "depraved indifference." "The change in law announced in *Feingold* firmly and finally altered the depraved indifference element of depraved indifference murder, but did not change the recklessness element. This change in law, moreover, is not retroactive, and therefore has no bearing on defendant's conviction, which was finalized a year before the Court of Appeals rendered the *People v. Feingold* decision." *People v.*

*James,* No. 2311/01, 2007 WL 959712, \*3 (N.Y. Sup. Ct. Mar. 30, 2007) (citing *Policano v. Herbert*, 7 N.Y.3d 588 (N.Y. 2006)). Jones' case therefore is governed by the prior "depraved indifference" standard set forth in, *e.g., People v. Register*, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d 704 [1983], *cert. denied* 466 U.S. 953, 104 S.Ct. 2159, 80 L.Ed.2d 544 [1984], *overruled by People v. Feingold*, 7 N.Y.3d 288, 819 N.Y.S.2d 691, 852 N.E.2d 1163 [2006] ), *People v. Sanchez.*

In the *Register* line of decisions, the New York Court of Appeals had held that "depraved indifference, as applied to the crimes of murder, assault, and reckless endangerment, was neither a culpable mental state nor a specific set of actions. . . [T]hose cases held that depraved indifference murder included a *mens rea* of recklessness, and that the crime's proof entailed a showing that the circumstances surrounding the crime, when objectively viewed, evinced depraved indifference to human life." *People v. Danielson*, 40 A.D.3d 174, 189, 832 N.Y.S.2d 546, 557 (App. Div. 1st Dept. 2007) (dissenting opn.); *see also People v. Wells*, 53 A.D.3d 181, 189, 862 N.Y.S.2d 20, 26 (App. Div. 1st Dept. 2008) ("Under *Register, depraved indifference murder requires that a defendant's act be imminently dangerous,* present a very high risk of death to others and be committed under circumstances that evince a wanton indifference to human life or a depravity of mind (*see Register*, 60 N.Y.2d at 274, 469 N.Y.S.2d 599, 457 N.E.2d 704). The requirement of depraved indifference refers neither to the *mens rea* nor to the *actus reus*; rather, it refers to "the factual setting in which the risk creating conduct must occur" (*id.* at 276, 469 N.Y.S.2d 599, 457 N.E.2d 704) (emphasis supplied)). "Typically, conduct must put multiple individuals at risk in order to satisfy the 'circumstances evincing a depraved indifference to human life' element." *People v. James*, 2007 WL 959712, at \*4.

Recklessness, on the other hand, is measured by proof of the defendant's subjective mental state. *People v. Parrotte*, 267 A.D.2d 884. 702 N.Y.S.2d 137 (3d Dept. 1999) (concurring opn.). The defendant's subjective mental state, however, is not pertinent to determining whether the objective circumstances bearing on the nature of his reckless conduct are such that the conduct created a very substantial risk of death. *People v. Roe*, 74 N.Y.2d 20, 24. 544 N.Y.S.2d 297); *People v. Parrotte*, 267 A.D.2d 884, 702 N.Y.S.2d 137 (3d Dept. 1999). New York's Penal Law states that "a person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists." N.Y. PENAL LAW § 15.05(3). "Therefore, the crime of first degree depraved indifference assault under Penal Law § 120.10(3) occurs when an actor 'is aware of and consciously disregards' 'a grave risk of death to another person.'" *People v. VanNorstrand*, *supra*.

Viewing the trial proof in the light most favorable to the prosecution, and drawing all reasonable inferences in its favor, the evidence established that Petitioner had been treated for epilepsy at least from January 1981 through to the date of the assault, and had experienced a seizure just three days prior to the incident. *See* T.717-20. During the eight month period preceding the collision, Petitioner had suffered numerous seizures which necessitated medical intervention. *See* T.638, 592, 628, 579-81, 615, 604. As a result of the most recent seizure pre-dating the incident, Jones had been taken by ambulance to the hospital. Jones, who was supposed to take doses of Dilantin and Phenobarbital twice daily to control his seizures, informed the doctor that he had missed a couple of doses of these medications. T.664-61, 671. Upon discharge, the treating doctor informed Petitioner that he had suffered an acute

breakthrough of his seizure disorder, resulting from his failure to take his prescribed medication. (An "acute breakthrough" describes what happens when a person whose condition was previously controlled with medication suddenly experiences a seizure.) As a result of this seizure, the doctor warned Jones not to drive a vehicle until he was seizure free for an entire year.

Petitioner acknowledged that, just three days prior to the incident, he had been admonished by the emergency room doctor that he should not drive for a year, and that he must take his prescribed medication on schedule. However, on the date of the collision Jones variously admitted that he had either last taken only one dosage of his medicine the previous morning, T.382, or was uncertain whether he had taken it at all, T.788.

The prosecution argued that, given the foregoing testimony by the medical personnel, among others, Petitioner "knew he was subject to epileptic attacks and seizures that might strike at any time, and also "knew that a moving motor vehicle uncontrolled on a public highway is a highly dangerous instrumentality capable of unrestrained destruction." People's Appellate Brief, (quoting *People v Decina*, 2 N.Y.2d 133, 139-140 (1956) (holding that an indictment which stated that defendant, knowing that he was subject to epileptic attacks rendering him likely to lose consciousness, was culpably negligent in that he consciously operated his automobile and while so doing suffered an epileptic attack causing his automobile to drive over a sidewalk, causing the death of 4 persons ([former] Penal Law, § 1053-a), was legally sufficient)). The prosecution argued that "[w]ith this knowledge, and without anyone accompanying him, [Petitioner] deliberately took a chance by making a conscious choice of a course of action, in disregard of the consequences which he knew might follow from his conscious act, and which in this case did ensue." *Id.* (quoting *Decina*, 2 N.Y.2d at 139-140).

I cannot say that the Appellate Division was "objectively unreasonable" in concluding that a rational jury, drawing all evidentiary inferences in favor of the prosecution and being instructed on the law of depraved indifference as it existed at the time, would be unable to find a valid line of reasoning from which it could conclude Petitioner, was aware of and consciously disregarded a substantial and unjustifiable risk brought about by operating a motor vehicle given his presently uncontrolled seizure disorder. Furthermore, and again drawing every favorable inference in the prosecution's favor, a valid line of reasoning existed from which a rational person, applying the law as it stood under *People v. Register*, could have found that Petitioner acted "[u]nder circumstances evincing a depraved indifference to human life." In *People v. Gomez*, referring specifically to the use of a motor vehicle "in a wanton and callous manner", New York Court of Appeals observed that "[t]he focus of the depraved mind murder statute is to allow a trier of fact to discern depravity of mind from the circumstances under which an object or instrumentality is used[.]" 65 N.Y.2d 9, 11-12 (N.Y. 1995) ("Driving a speeding motor vehicle onto a busy Manhattan street and then down a crowded sidewalk at a high rate of speed for two blocks satisfies the requirement that the defendant acted recklessly, i.e., that he was aware of and consciously disregarded a substantial and unjustifiable risk. . . . [D]efendant sped out of the gas station and entered traffic on a busy New York street at a speed in excess of 40 miles per hour. After striking two cars, he continued accelerating for nearly a block, partly on a sidewalk, until he struck the first victim. These factors, particularly the excessive speed and the failure to brake, satisfy the depraved indifference element."); *accord, e.g.*, *People v. Padula*, 197 A.D.2d 747, 602 N.Y.S.2d 737 (App. Div. 1993), *lv. denied* 82 N.Y.2d 928, 610 N.Y.S.2d 180, 632 N.E.2d 490 (N.Y. 1994) (excessive rate of speed, failure to brake or take other evasive action, and decision to

get behind the wheel of vehicle after becoming intoxicated, legally sufficient evidence of depraved mind murder)). *See also People v. Wells*, 53 A.D.3d 181, 189, 862 N.Y.S.2d 20, 26 (App. Div. 1st Dept. 2008) (Evidence that defendant's conduct displayed a depraved indifference to human life overwhelmingly supported conviction for depraved indifference murder and depraved indifference assault; having chosen to drive while highly intoxicated, defendant drove in an extremely reckless manner on city streets, failing to stop for traffic lights and, in fact, increasing his speed after narrowly missing one collision, before striking another vehicle, and fact that he tried to flee the scene showed he was not so impaired as to be unaware of what he had done.); *People v. Hoffman*, 283 A.D.2d 928, 725 N.Y.S.2d 494 (App. Div.), *lv. denied* 96 N.Y.2d 919, 732 N.Y.S.2d 636, 758 N.E.2d 662 (N.Y. 2001) (drinking and driving, excessive rate of speed, disobeying traffic signals, and failing to brake before he broadsided vehicle, killing and injuring the passengers therein, legally sufficient evidence of depraved mind murder).

Given the circumstances present here and the law in force at the time of Petitioner's conviction, I cannot find that the Appellate Division unreasonably applied the "rigorous standard," *Wheel*, 34 F.3d at 66, set forth in *Jackson v. Virginia* and *People v. Contes*, for evaluating the legal sufficiency of the evidence supporting Petitioner's conviction for depraved indifference assault.

## 2.      Weight of the Evidence

Petitioner's further claim that the verdict is against the weight of the evidence is not a cognizable claim on federal habeas review. *E.g.*, *Young v. Abrams*, 698 F.2d 131, 135 (2d Cir. 1983); *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) ("a writ of habeas corpus cannot be

used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923). Therefore, it must be dismissed.

**D.** **Failure to Suppress Statements Made by Petitioner in the Ambulance and at the Hospital**

Petitioner contended on direct appeal that Jones' statements made in the ambulance and at the hospital were all made under conditions that constituted the practical equivalent of custodial interrogation requiring prior issuance of the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and therefore the trial court committed reversible error in denying the defense motion to suppress those statements. The prosecution countered that rather than being subjected to interrogation, Petitioner merely underwent questioning that was investigatory in nature, and was designed to clarify the nature of the situation confronted, rather than to coerce a statement from a suspect. As a consequence, the prosecution contended, *Miranda* warnings were not required.

**1.** **The Suppression Hearing and the State Courts' Holdings**

A pre-trial hearing was held relating to the suppression of oral and written statements made by Jones. 8/21/00 Tr. at 3-4. The relevant testimony is summarized below.

**a.** **The Statements by Petitioner in the Ambulance**

At approximately 10 a.m. on January 18, 2000, Rochester Police Officer Adin Feliciano was sent to the intersection of South Clinton Avenue and East Main Street to assist with an automobile accident: "pedestrian struck, officer down." 8/21/00 Tr. at 18. At the scene he observed that a blue Cadillac had struck a police vehicle. An officer was being put on a stretcher. The operator of the blue Cadillac was slumped over the steering wheel of his vehicle. *Id.* at

18-19. Although the driver appeared conscious, he did not move. *Id.* at 19-20. It turned out that Jones was semi-unconscious when he was taken out of the car and placed on a flat board. 8/21/00 Tr. at 21, 37. Officer Feliciano assisted the fire department and the emergency medical technicians ("EMTs") in removing Jones from the vehicle, *id.* at 20, 37, but did not take Jones into police custody at the scene, *id.* at 20.

Rochester Police Officer John Zampatori testified that on January 18, 2000, he responded to a call on the police radio regarding an officer down in the area of Main Street at South Clinton Avenue where he performed duties relating to traffic control. 8/21/00 Tr. at 50-51. As Officer Zampatori observed Jones being loaded into the ambulance, Jones was struggling, yelling, and flailing as the ambulance crew attempted to put him on the gurney. *Id.* at 62-63. The struggling appeared to continue after they put him in the ambulance. *Id.* at 63; *see also id.* at 25, 37-38 (testimony of Lieutenant Keenan). The EMTs and firefighters finally succeeded in placing Jones on a gurney, whereupon they strapped him to the gurney using restraints. *Id.* at 25, 37.

Officer Zampatori's supervisor directed him to follow the ambulance to the hospital. *Id.* at 52. Officer Feliciano was instructed by Lieutenant Keenan to ride in the ambulance with Jones and to check him for signs of intoxication. 8/21/00 Tr. at 21-23, 39, 40-42. Officer Feliciano was the sole member of the Police Department in the ambulance. *Id.* at 25. Officer Feliciano wore his RPD uniform including a nametag and an orange raincoat over his shirt. *Id.* at 28. He did not identify himself to Jones. *Id.* The only observation Officer Feliciano made that could be consistent with Jones having been driving while intoxicated was the fact that Jones was found slumped over the wheel. *Id.* at 41.

While in the ambulance, Officer Feliciano observed Jones while EMT personnel

continued to attend to him. 8/21/00 Tr. at 23. Officer Feliciano described Jones as combative, i.e. he was ripping at his clothing, pulling his hands out of the restraints, trying to stretch himself out of the gurney, and trying to yank the brace off his neck. *Id.* at 23-24. Based on his experience, Officer Feliciano concluded that Jones had undergone a seizure. *Id.* at 24.

Officer Feliciano helped the EMTs subdue Jones in the ambulance again. 8/21/00 Tr. at 38. Officer Feliciano placed his hand on Jones' chest hard enough to hold him down. *Id.* at 38-39. Jones wanted to get up, while the EMTs wanted him to remain flat. *Id.* at 38. Concerned about neck damage, the EMTs wanted to but a brace on his neck. *Id.* at 23, 39. They believed Jones was still seizing. *Id.* at 39.

En route to the hospital, the EMTs discussed Jones' medical history with him. 8/21/00 Tr. at 43. Jones replied that he suffered from epilepsy. *Id.* at 43. Officer Feliciano listened to a discussion between Jones and the EMTs about whether Jones had been taking his medication. *Id.* at 44. Jones' response was that he had a history of epilepsy for which he took medication twice daily. *Id.* at 29.[3]

Officer Feliciano spoke with Jones when Jones became oriented and while Jones was somewhat responsive. *Id.* at 23-24. After learning Jones' name, Officer Feliciano requested some identification, but since Jones could not remove his wallet from his pocket, Officer Feliciano

---

[3]     Rochester Police Officer Gary Galetta testified that on January 18, 2000 he aided in the investigation of Edward Jones and the injuries sustained by Officer Scott McLaughlin 8/21/00 Tr. at 7. He obtained background information from other officers, including the fact that Jones suffered from epilepsy. *Id.* at 8, 14.
        In the late afternoon, Officer Galetta interviewed Diane Granville, Jones' girlfriend of two months, at the Public Safety Building. 8/21/00 Tr. at 8. The purpose of the interview was to obtain information regarding Jones' physical and medical background. *Id.* at 8. Granville indicated that she had recently learned Jones suffered from epilepsy. *Id.* at 9. Jones had told her he did not have seizures, just "shakes," and he controlled the condition with medication. *Id.* at 10.

retrieved Jones' wallet out of his pocket for him. 8/21/00 Tr. at 26-27, 44. Jones retrieved a Department of Motor Vehicles identification card, an expired New York State learner's permit and a Medicare card from his wallet and handed these items to Officer Feliciano, who put them with the traffic tickets issued as a result of the collision and gave them to his supervisor. *Id.* at 27, 44-46.

Not realizing that he had been involved in an accident, Jones inquired as to where he was going and the location of his car. 8/21/00 Tr. at 28. Officer Feliciano told Jones that he had been involved in an accident with a police vehicle, and that the police were taking his car to the police impound lot. *Id.* at 28, 46-47.

### b. Petitioner's Statements at the Hospital

The ambulance transported Jones to Strong Memorial Hospital. 8/21/00 Tr. at 26. Upon arrival, around 10:30 a.m., EMT personnel wheeled Jones into the emergency area of the hospital. *Id.* at 29, 31.

Officer Zampatori met the ambulance at the hospital. 8/21/00 Tr. at 54. Officer Feliciano asked him to keep an eye on the motorist involved in the accident and left almost immediately thereafter. *Id.* at 55. At that point, Officer Zampatori relieved Officer Feliciano from duty. *Id.* at 26, 48.

Once at the hospital, Officer Feliciano had no further contact with Jones. He never handcuffed Jones or placed him under arrest. Sometime after 11 a.m., Officer Feliciano assisted Officer Samuel Palermo fill out five traffic tickets. All of the tickets involved vehicle and traffic charges, including a ticket charging Jones with not carrying car insurance. 8/21/00 Tr. at 31-36. These tickets were eventually turned over to the officers' supervisor. *Id.* at 34, 36.

When Officer Zampatori entered the hospital, Petitioner lay in the hallway on a gurney. 8/21/00 Tr. at 55, 64. Officer Zampatori positioned himself on the north wall, standing about ten feet behind Petitioner's head. *Id.* at 55. Officer Zampatori did not approach Petitioner to speak to him. *Id.*. Officer Zampatori remained at the hospital from about 10:30 am until 2 p.m. *Id.* at 56. He was relieved by another officer on two occasions. *Id.* at 56, 67.

Officer Zampatori observed Officer Charles Weader have some type of verbal contact with Petitioner while he lay on the gurney. 8/21/00 Tr. at 59. Lieutenant Keenan had directed Rochester Police Officer Charles Weader to respond to Strong Memorial Hospital Emergency Department to check the driver of the motor vehicle for possible drugs use and his presence at the hospital was at the lieutenant's request. 8/21/00 Tr. at 71. Officer Weader testified that when he first walked into the hospital between 10:30 and 11 a.m. He observed medical personnel treating the driver of the motor vehicle. *Id.* at 72. They checked the motorist's blood pressure, as well as checking for head injuries, broken bones, and whether the man was in pain. *Id.* at 72, 82, 84.

Officer Weader stood, in uniform, about 10 to 15 feet away from Petitioner while hospital personnel treated him. 8/21/00 Tr. at 73. Officer Weader did not speak to Petitioner prior to his receiving medical treatment. 8/21/00 Tr. at 72. Officer Zampatori stood off to his left, approximately 15 feet from Petitioner. 8/21/00 Tr. at 73. Hospital personnel treated Petitioner in Officer Weader's presence for about 15 to 20 minutes. *Id.* at 72-73. Officer Weader asked the head doctor and nurse if they were finished treating Petitioner medically because he needed to check Petitioner and to observe his condition for drugs. *Id.* Officer Weader did not ask what medical treatment had been given to the motorist. *Id.*

Once medical personnel were done, Officer Weader approached, introduced himself, and

explained to Petitioner that he needed to check his medical condition as a result of a motor vehicle accident. 8/21/00 Tr. at 74-75. Officer Weader did not ask Jones for permission to examine him. *Id.* at 87. Jones did not give any verbal acknowledgment and, according to Weader, Jones just shook his head "like he understood what [Weader] was sayiing to him" and "sort of agreed," *Id.* at 75, 86-87. Officer Weader questioned Jones about any history of medical problems, and Jones disclosed that he had had seizures since the age of sixteen. *Id.* at 75, 77, 87. Jones stated that he took Dilantin and Phenobarbital to control seizures. *Id.* at 76.

Officer Weader checked Jones' pulse, body temperature, pupil size, and reaction to light, concluded that Jones exhibited no clinical signs that he was under the effects of any illegal drugs. 8/21/00 Tr. at 78. (Lieutenant Keenan did not advise Officer Weader that Jones had already been checked to determine whether he was driving while intoxicated. *Id.* at 81.) Jones appeared responsive and coherent. *Id.* at 79-80. He did not appear to be restrained. *Id.* at 80. Officer Weader spent 20 to 25 minutes speaking with Jones. *Id.*

Jones indicated he had last taken medication the morning before the day of the collision. 8/21/00 Tr. at 77, 93. Jones explained that he had spent the night at his brother's house and was on his way home to take his medication when the crash occurred. *Id.* at 77, 88. He did not say anything about having had a seizure at his brother's house. *Id.* at 77. Jones' next recollection was being in the ambulance on the way to the hospital. *Id.* at 88. Petitioner asked, "Did I hit a policeman or a police car?" *Id.* at 88. Officer Weader explained, "Well, you hit both." *Id.* There was no conversation after that.

With the exception of time that Officer Weader spoke with him, the motorist slept most of the time. *Id.* at 60. Officer Zampatori never saw Petitioner get off the gurney, nor did he recall

seeing Petitioner actually sit up, although he did see Petitioner move around a bit. *Id.* at 59-60.

Petitioner was not restrained on the gurney by either medical-type restraints or by police

intervention restraints. 8/21/00 Tr. at 60, 62. Petitioner did not make eye contact with Officer

Zampatori. Several doctors and nurses spoke to Petitioner during the time that Officer Zampatori

had stationed himself near Petitioner's gurney, but he did not observe any actual type of

treatment. 8/21/00 Tr. at 61, 65-66.

Rochester Police Officer Donald Liberti testified that he escorted the ambulance that

carried the officer who had been hit by Petitioner's car. 8/21/00 Tr. at 96. While at the hospital

he relieved Officer Zampatori on two occasions. *Id.* at 99-100, 102, 105. He stood about 4-5 feet

away from Jones who was sleeping on a gurney. *Id.* at 99. On both occasions, neither he nor any

other police officers in his presence engaged in conversation with Jones. *Id.* at 100, 102. Officer

Liberti did not believe medical personnel attended to Jones during that time frame. *Id.* at 100.

Jones appeared asleep on both occasions. *Id.* at 100, 102.

The second occasion Officer Liberti was with Jones, he thought Officer Feliciano

relieved him. 8/21/00 Tr. at 103. Officer Liberti then returned to the to the meeting room. *Id.* at

103. He later learned that Investigator Janus was gone from the area where Jones' gurney had

stood, and was with Jones in a room down the hallway. *Id.* at 103. Officer Liberti was standing

outside in the hallway when Investigator Janus opened the door to request assistance because

Jones was having another seizure. *Id.* at 103, 105. Officers Liberti and Friedlander assisted

Investigator Janus in helping Jones to lie down on the floor. *Id.* at 104. Officer Liberti left when

medical personnel arrived. *Id.* at 104.

Investigator Thomas Janus testified that when he arrived at the scene, he observed an

individual in a dark blue Cadillac. The man had on a seatbelt. His eyes were closed and he appeared to be snoring. 8/21/00 Tr. at 153. Fire personnel assisted other police officers and an ambulance crew. *Id.* When removed from the vehicle, the motorist appeared to wrestle with members of the ambulance crew. *Id.* at 154, 202. Jones appeared to push the EMTs hands away. 8/21/00 Tr. at 202 .

The EMTs placed Jones on the gurney and transported him from the scene in an ambulance. 8/21/00 Tr. at 155. During the next hour and a half Investigator Janus sequestered some witnesses and with assistance obtained depositions. *Id.* He then went to the hospital. *Id.* at 156. He heard from officers in the conference area, specifically from Officer Feliciano, that the driver suffered from epilepsy and possibly had had an epileptic seizure prior to the accident. *Id.* at 157, 204-05.

When Investigator Janus first observed Jones, he was lying on a gurney in a hallway and appeared to be asleep. 8/21/00 Tr. at 158, 205. A uniformed police officer stood about ten feet from Jones. T 8/21/00 at 158, 205. Around 12:15 p.m., Investigator Janus heard from police personnel that Jones was to be discharged. T 8/21/00 at 162, 206.

Investigator Janus asked the treating physician. Dr. Souder, about what medication Jones had received. 8/21/00 Tr. at 207. At that point in time, Inv. Janus had not yet received a medical waiver or release from Jones. *Id.* at 208. Dr. Souder indicated that Jones had received Dilantin. *Id.* Dr. Souder discussed the effects of Dilantin on Jones with Inv. Janus. *Id.*

At 2:10 p.m. Inv. Janus asked Jones his permission to speak with him. 8/21/00 Tr. at 160-61,163, 206. At that point in time, Jones was awake, sitting up on the gurney, and had his discharge papers in his hand. *Id.* at 163-64. Jones verified with a nurse that he was discharged

and medically cleared to leave. *Id*.

Jones responded affirmatively to Janus, that he was willing to speak with him. Jones accompanied Investigator Janus to a room about 15-20 feet down the hall. 8/21/00 Tr. at 165. Jones walked on his own, and appeared not to have any difficulty. *Id*. at 172. Investigator Janus closed the door to the room. *Id*. at 166, 208-09. Jones sat at a table. 8/21/00 Tr. at 166. Investigator Jones said that he wanted to speak to Jones about the accident and what had happened, and Jones explained that he had epilepsy and he believed he had had a seizure. *Id*. at 166, 209. Inv. Janus questioned him about the accident, about his epilepsy, and about the last time he had taken his medication. *Id*. at 209. Jones replied that it was permissible for him to take a full day's dose of medication at one time and that he had done so the day before. *Id*. at 215. Jones indicated that he could generally tell when a seizure was coming on, but he had had no such indication prior to the accident. *Id*.

Jones was not asked to sign a statement at that time. He did not say that he wanted to leave or that he wanted a lawyer. 8/21/00 Tr. at 167.

After approximately five or six minutes, Jones appeared to suffer from a second epileptic seizure. 8/21/00 Tr. at 167, 209. Jones did not respond to the last question Investigator Janus testified asked of him. Jones looked off into the distance, his body became rigid, and he began to shake. *Id*. at 167, 210, 213. Investigator Janus opened the door and called down the hall. Officer Liberti responded and assisted in lowering Jones to the floor. *Id*. at 168. 211. Investigator Janus left the area once medical staff arrived. T 8/21/00 at 167.

About one hour later, Investigator Janus returned to check on Jones, who was on a gurney in the same spot he had been. This was about 3:15 p.m. 8/21/00 Tr. at 169. Jones appeared to be

sleeping. *Id.* at 170.

At approximately 4:10 p.m., Investigator Janus testified, a nurse or emergency room technician physically awakened Jones by calling his name and gently shaking him. *Id. at* 171, 211. Jones sat up, and was provided with a meal from the hospital. *Id.* at 171.

Inv. Janus then walked up and reintroduced himself. 8/21/00 Tr. at 173. Jones responded that he recalled talking with him. *Id.* at 173. Inv. Janus told him that he could give him a ride from the hospital if there was no one else able to take him. *Id.* at 174. Jones accepted the offer. 8/21/00 Tr. at 174.

Dr. Souder informed Inv. Janus that Jones would be discharged when he completed his meal and his paperwork was finished. 8/21/00 Tr. at 174. Inv. Janus asked the doctor what medications Jones had received and if those medications would impair him in any way. *Id.* at 175, 117. Dr. Souder told him that Jones' blood level of Phenobarbital was slightly elevated and that Jones had been given only Dilantin because his blood level of Dilantin was slightly down. He further stated that someone who had been on medication as long as Jones would not be impaired by the dosages received at the hospital that day. *Id.* at 175.

After speaking to the doctor, Inv. Janus asked Jones if he would be willing to sign a consent form that would grant the police department consent to check his medical history and records from the time he was 16 up to and including medical treatment he had received that day which he did sign. 8/21/00 Tr. at 175-78, 214. At this point, Jones had been awake approximately 30 minutes. *Id.* at 214. Inv. Janus returned to the area designated for police officers and gave the consent form to Sgt. Gerbino. 8/21/00 Tr. at 179-80.

Sgt. Gerbino informed Inv. Janus that he wanted a more detailed consent form indicating

that more specific areas of Jones' medical treatment could be explored. 8/21/00 Tr. at 180.

Approximately one hour later, Inv. Janus and Sgt. Gerbino presented a second form to Jones. *Id.*
at 180-81.

After Jones signed the second consent form, Inv. Janus spoke with Jones "a little bit
more about his condition." T 8/21/00 at 180-82. Jones was still cooperative in all respects. *Id.* at
182. At one point, Jones called Dr. Souder over to ask what the levels of his medications were
found to be in his blood. T 8/21/00 at 182. Dr. Souder told Investigator Janus that medically,
Jones' condition should have prevented him from driving. 8/21/00 Tr. at 183, 220-21. Jones
"then offered that he had been told by a physician that he could drive if he went one year
seizure-free." *Id.* at 183, *see also id.* at 220-21. This conversation took place just before 6:00
p.m., prior to Jones being discharged. *Id.* at 221. Sgt. Gerbino spoke further with Jones outside
Inv. Janus' presence. *Id.* at 183. Investigator Janus did not know what that conversation was
about. *Id.*

### c.    Petitioner's Post-*Miranda* Statements at the Police Station

At around 6:00 or 6:15 p.m., Investigator Janus told Petitioner that he would go get his
car and pull around to the emergency room doors and pick him up. 8/21/00 Tr. at 185. Jones
agreed to go with him to the Public Safety Building to talk further about the accident; Jones did
not express any reluctance or ask if he was required to go. *Id.* at 184.

Sgt. Gerbino had come to the area and was talking with Jones and Jones' girlfriend,
Diane Granville ("Granville"). *Id.* at 185. Sgt. Gerbino asked Jones if he would mind coming
downtown with him. 8/21/00 Tr. at 122, 126. When Jones inquired what would happen from
that point forward, Sgt. Gerbino replied that there were some traffic tickets that needed to be

addressed. *Id.* at 126. Sgt. Gerbino said, "We weren't sure about other charges, and that's what we would like to do is go downtown and further discuss the situation . . . ." *Id.* According to Sgt. Gerbino, Jones had no object at all to coming to the police station. *Id.* at 127.

Granville asked Sgt. Gerbino, "Is he being arrested?" 8/21/00 at 128. He indicated that the police "were uncertain as to whether he was going to be arrested at that point", that there were some unresolved traffic tickets, and Jones was voluntarily coming to the police station. *Id* at 128-29. Granville was informed that she was welcome to come down to the police station. *Id.* at 129-30.

Sgt. Gerbino walked into the Public Safety Building with Jones. 8/21/00 Tr. at 131. Jones was escorted to an office. *Id.* at 133, 188. In Sgt. Gerbino's presence, Inv. Janus advised Jones of his constitutional rights pursuant to *Miranda*, which Jones acknowledged and waived. *Id.* at 133, 137, 190-92. Jones agreed to speak with the officers. *Id.* at 137, 190-94. Jones was presented with some traffic tickets. 8/21/00 Tr. at 134. Sgt. Gerbino recalled explaining to Jones that the case might go to a grand jury, but he was not certain. *Id.* at 134[4].

First Investigator Janus and Jones spoke a little more about the traffic tickets. Then Inv. Janus asked Jones to tell him about the events of that day. *Id.* at 194. Eventually, Inv. Janus reduced what Jones' verbal statement to writing. *Id.* at 195-97. Jones reviewed the statement and signed it in the presence of Inv. Janus and Sgt. Gerbino. *Id.* at 197. Inv. Janus had further

---

[4]    Sgt Gerbino was not present for the initial interview about the incident. However, he was present for the review of Petitioner's written statement, which included details of the incident. *Id.* at 135. Sgt. Gerbino entered and left the interview room on more than one occasion during this process. *Id.* He believed he spoke with Jones on three separate occasions. 8/21/00 Tr. at 136. Sgt. Gerbino asked, "if he knew of his condition, why did he get behind the wheel of a car." *Id.* at 139. In a separate conversation, Sgt. Gerbino asked if he "had any remorse or . . . regret that he exposed other people on the street to that hazard." *Id.* "Both of those times [Jones] put his head down and shrugged and kinda shook his head like that (indicating). . . ." *Id.* at 139-40.

conversations with Jones intermittently after Jones signed the statement. *Id.* At some point. Inv. Weather and Reinstein were also allowed to speak with Jones. *Id.* at 200. Inv. Janus did not participate in that part of the interview. *Id.*

The following day, Inv. Janus spoke with Dr. Sato. 8/21/00 Tr. at 201. Dr. Sato had attended to Jones the previous Saturday when Jones had had an epileptic seizure. *Id.* Investigator Janus asked if Jones should be driving; Dr. Sato initially said that he had heard that Jones did not have a license. *Id.* at 221. Investigator Janus asked Dr. Sato whether Jones' medical condition should preclude him from driving; Dr. Sato replied that it should. *Id.* at 221. (In the conversation among Dr. Souder, Investigator Janus, and Jones just prior to Jones' discharge from the hospital, Jones had mentioned Dr. Sato's instructions about not driving but did not refer to Dr. Sato by name. *Id.*)

Inv. Ronald Reinstein testified that at 8 p.m. on January 18, 2000, Sgt. Gerbino instructed him and his partner to go to Jones' residence to retrieve his epilepsy medication. 8/22/01 Tr. at 231, 240. The officers retrieved four pill bottles from a dresser. 8/22/01 Tr. at 231. They also took some papers (ambulance receipts, medical receipts, and a paper regarding Jones' driver's license) and some other pill bottles related to Jones' epilepsy. *Id.* at 231, 24-47. The pill bottles were located in the room where Jones slept. *Id.* at 232. The officers spoke with Jones' godfather who told them Jones had lived with him and his wife them since Jones was a boy. He had witnessed Jones having several epileptic seizures. *Id.* at 231.

At approximately 10:10 p.m., Inv. Reinstein and his partner Inv. Weather spoke with Jones in a room at the Public Safety Building. 8/22/00 Tr. at 233, 240. They had been briefed about what had occurred prior to their involvement with the case, and talked with Jones about his

epilepsy, when his seizures had last occurred, what he had been advised by his doctors regarding driving, his family, and the time he had spent in prison. 8/22/00 Tr. at 233-34. Jones told the officers said that the vehicle was his, but because his license had been suspended, he had it registered and insured in his girlfriend's name. *Id.* at 235. Jones then stated he usually experienced warning signs prior to seizures, but that it had not occurred prior to the last three seizures. 8/22/00 Tr. at 242. Jones explained that the warning sign, or "aura", would be a tingling sensation, sometimes accompanied by a jerk of his hand or his arm. 8/22/00 Tr. at 245. He stated that he had had two seizures on the weekend prior to the incident, and then the one when Officer McLaughlin was injured. 8/22/00 Tr. at 242-43.

Inv. Reinstein was with Jones for approximately two hours. 8/22/00 Tr. at 236. Inv. Reinstein asked Jones if he required medication that night. Jones maintained that he did not because had been given a sufficient amount of medication at the hospital. 8/22/00 Tr. at 238.

During the interview with Reinstein, Jones volunteered information that his driving privileges had been suspended. 8/22/00 Tr. at 245. He did not say why his license had been suspended, but said that he tried, albeit unsuccessfully, to clear up the problems with the Department of Motor Vehicles. *Id.* at 245.

## 2.    The State Courts' Rulings

At the conclusion of the hearing, the suppression court ruled that the statements given by Jones to the police throughout the day– i.e. in the ambulance, at the hospital and at the police station–were all voluntary. 8/22/00 Tr. at 259-60. Petitioner knowingly and voluntarily signed two forms consenting to receive medical treatment. 8/22/00 Tr. at 259.

The overall picture is the police went to the scene of a motor vehicle accident and

began an investigation. The investigation continued with full cooperation of this defendant, Edward Jones. I find that there has been no establishment that the emergency medical technician in this particular situation was covered by the doctor-patient privilege. The proof is not there.

At any rate, even if there was coverage, I find that the officer in the ambulance was properly there as a part of the ongoing investigation, and I also would add at this moment that there is no requirement that the police arrest someone and close out a case prematurely. They may continue their investigation until they've done a thorough, proper job of it.

The defendant voluntarily talked to the police throughout this day of January 18th. There was nothing done by the police to force the defendant to speak with the police. There were no threats, no pressures, no undue influence used on the defendant.

The evidence began to mount that the defendant had serious problems with his medical condition, serious problems that displayed themselves even after he had been initially treated by the physicians at the hospital.

The defendant voluntarily signed two consent forms and he knew what he was doing. He was not pressured. The police procured medicines and prescriptions from his home.

At the police station, the defendant made a knowing, intelligent and voluntary waiver of his rights [sic] not to speak to the police. He understood those rights and waived them. Once again, there were no promises, threats or undue influence to induce him to make those statements.

I find, using the test of beyond a reasonable doubt, that at no time during police questioning or discussions with the defendant was the defendant deprived of any of his rights under t he United States Constitution or the State Constitution or their [sic] statutes or case law.
. . .
The defendant did not object at any time to the police and the doctor discussing his condition. The only controversial matter was the police officer asking the doctor if the defendant was okay to talk to the police, and I find that the defendant did not object to the doctor telling the police that the defendant was good enough to talk to him. As a matter of fact, the defendant was anxious and did talk to the police. Really makes no difference what the doctor said at that time. In any case, that statement by the doctor will not be admissible at trial for other reasons. Based upon the totality of the record, the defendant's motions [to suppress] are denied in their entirety.

8/21/00 Tr. at 258-61. As to the officer's procurement of Jones' wallet from him, the suppression court held that it was not improper in that it was part of the investigation. Furthermore, upon arresting Jones at the time of booking, the police were justified in holding the evidence of his identification pending any further court order.  8/22/00 Tr. at 260.

Based on the totality of the record, the suppression court denied the defense motions to preclude admission of Jones' statements. 8/22/00 Tr. at 261. On appeal, the Appellate Division "conclude[d] that the [suppression] court properly refused to suppress defendant's statements to police in the ambulance and in the hospital based on the court's finding, which is supported by the evidence at the suppression hearing, that defendant was not in custody when he made those statements[.]" *People v. Jones*, 11 A.D.3d 902, 903, 782 N.Y.S.2d 322, 324 (App. Div. 4th Dept. 2004) (citing, *inter alia*, *People v. O'Hanlon*,  5 A.D.3d 1012, 1012, 773 N.Y.S.2d 63 (App. Div. 4th Dept. 2004) ("County Court properly determined that the statement of defendant to the police officer at the hospital prior to his arrest was elicited in the course of the officer's investigation of the accident and was not the product of a custodial interrogation[.]"); *People v. Atwood*,  2 A.D.3d 1331, 1331-32, 768 N.Y.S.2d 918 (App. Div. 4th Dept. 2003) ("Defendant further contends that the court should have suppressed his statements to the police because some statements were made while he was in custody and before he was advised of his *Miranda* rights, and other statements were made after an unknowing and involuntary waiver of those rights. We disagree. The court properly determined that defendant was not in custody until he was arrested, after being treated at the hospital. In any event, the statements made by defendant before he was arrested were not the product of custodial interrogation but, rather, were elicited in the course of an accident investigation. After the police advised defendant of his *Miranda* rights, defendant

knowingly and voluntarily waived those rights.") (citations omitted)).

### 3. Whether the state courts unreasonably applied Federal law

In order to determine whether *Miranda* warnings were necessary, the Court must perform

a two-step analysis. First, the Court must determine whether Jones was "in custody." If the Court

finds that he was in custody, it must then decide whether Jones was subjected to "interrogation."

*See Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) ("It is

the premise of *Miranda* that the danger of coercion results from the interaction of custody and

official interrogation."); *accord*, *e.g.*, *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir.1994)

("Because the presence of both a custodial setting and official interrogation is required to trigger

the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated.")

(citing *Miranda*, 384 U.S. at 477-78; *United States v. Mesa*, 638 F.2d 582, 584-85 (3d

Cir.1980)).

As the Supreme Court has explained, "police officers are not required to administer

*Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492,495

(1977). Rather, "*Miranda* warnings are required only where there has been such a restriction on a

person's freedom as to render him 'in custody.'" *Id.* Under both Federal and New York state law,

the test for determining whether an accused is "in custody" for *Miranda* purposes is an objective

one:

> In determining whether a suspect was in custody, we look at all the circumstances
> surrounding the interrogation. The relevant inquiry is "how a reasonable man in
> the suspect's position would have understood his situation." *Berkemer v.
> McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151-52, 82 L.Ed.2d 317 (1984).
> And custody exists for *Miranda* purposes if a reasonable person in that position
> would "have felt he or she was not at liberty to terminate the interrogation and
> leave." *Thompson*, 516 U.S. at 112, 116 S.Ct. at 465.

*Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998); *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995) ("[T]wo discrete inquiries are essential to the determination" of whether a defendant has been taken into custody for *Miranda* purposes: "first, what were the circumstances surrounding the interrogation; and second, given the circumstances, would a reasonable person have felt he or she not at liberty to terminate the interrogation and leave." ) (footnote omitted).[5]

*Accord*, *e.g.*, *People v. Yukl*, 25 N.Y.2d 585, 589, 256 N.E.2d 172, 174, 307 N.Y.S.2d 857, 859 (N.Y. 1969) (In deciding whether a defendant was in custody at the time of questioning, the test "is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position.), *rearg. denied*, 26 N.Y.2d 883, 309 N.Y.S.2d 1032, 258 N.E.2d 223, *cert. denied*, 400 U.S. 851, 91 S.Ct. 78, 27 L.Ed.2d 89. "As evidenced by the Supreme Court's repeated rehearsal of the issue, the term 'custodial interrogation' defies easy definition." *Alston v. Redman*, 34 F.3d at 1245.

With regard to the "circumstances" aspect of the custody test, courts are directed to consider various factors, including whether the suspect is told that he is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation. *See*, *e.g.*, *Campanieria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir.1989) ("An accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.") (citation omitted), *cert. denied*,

---

[5]  "Because a custody determination presents a mixed question of law and fact, a habeas court undertakes an independent review of the record to determine whether the petitioner was in custody." *Nova v. Bartlett*,  211 F.3d 705, 707 (2d Cir. 2000) (citing *Thompson v. Keohane*, 516 U.S. at 112-13).

499 U.S. 949 (1991); *Oregon v. Elstad*, 429 U.S. at 494-95; *United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir.1987) ("It is undisputed in the instant case that Guarno was not placed under arrest at the motel. The district court also found that the agents did not threaten Guarno with arrest if he refused to cooperate. Moreover, the federal agents did nothing to suggest that 'they would not have heeded a request [by Guarno] to depart or to allow [him] to do so.' *United States v. Hall*, 421 F.2d at 545. Indeed, they told Guarno that he was free to leave the motel room whenever he wished to do so. Guarno therefore was not 'in custody' or otherwise deprived of his freedom of action to an extent requiring the administration of *Miranda* warnings."); *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984).

Summarizing several of its holdings concerning the "custody" determination for *Miranda* purposes, the Supreme Court concluded, "[i]t is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, *if undisclosed*, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury v. California*, 511 U.S. 318, 324 (1994) (citing  F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 232, 236, 297-298 (3d ed. 1986)); *see also id*. ("Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry."). However, the Supreme Court explained, a police officer's "knowledge or beliefs [about the suspect's involvement] may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325 (citations omitted); *accord, e.g.*, *United States v. Jacobs*, 431 F.3d at 105 (3d Cir. 2005).  Such beliefs held by the interrogating officer are not dispositive

of the custody question; rather, the Supreme Court has held, they are "relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. at 440). "When the individual has not been openly arrested when the statements are made, '" something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'"'" *Reinert v. Larkins*, 379 F.3d 76, 86 (3d Cir. 2004) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir.1974) (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir.1969))).

a.    **As to the statements made by Petitioner in the ambulance**

In *Reinert v. Larkins*, the Third Circuit confronted a situation similar to that presented by Jones' case, in that petitioner Reinert argued that he was in police custody while being transported by ambulance from the crime scene to the hospital. At the time of his initial statement Reinert was in the ambulance being tended to by the EMTs. After asking questions about his past medical history and allergies to medications, the EMT, in an effort to find out how the injury to the abdomen was sustained, asked Reinert what happened. The EMT received this response from Reinert: "I stabbed him with a butcher knife, then I did myself." At this point, the EMT notified the police officer who was in the ambulance, and went on with his treatment of Reinert. The police officer, without advising Reinert of his *Miranda* rights, asked him, "What happened?" and Reinert responded to the question by stating, "I think I killed him. I think I stabbed him." At that point, the officer read Reinert his *Miranda* rights.

The Third Circuit concluded that at the time of Reinert's first statement, made to an EMT

when he was being transported to the hospital for treatment (at which time he was not a crime

suspect and indeed was considered a possible victim), he was not in custody, even though a

police officer was present in the ambulance.[6] The Third Circuit explained,

> More to the point, although Officer Zimmerman was present under the described circumstances, the case of ambulance transportation is oblique to the core of "in custody" jurisprudence where the focus is on the relationship between the officers and the suspect in terms of putative coercion and freedom to leave. In our view, the presence of Zimmerman in the ambulance was a background factor in terms of Reinert's statement to [the EMT]. Reinert had entered the ambulance voluntarily and was in the charge of the EMTs who elicited the challenged statement innocently (they did not know Reinert to be a criminal suspect) in the course of obtaining routine medical information. Under these circumstances, and others recited above, we do not think that the state trial judge's determination was based on an unreasonable determination of the facts in light of the evidence. Nor was the legal conclusion based thereon contrary to or an unreasonable application of federal law as determined by the Supreme Court. Accordingly we will affirm the order of the District Court on that issue.

*Reinert,* 379 F.3d at 87.

In Jones' case, it is not strictly accurate to say that he entered the ambulance voluntarily;

the record indicates that he resisted the EMTs efforts to place him on the gurney. However, those

actions by Jones appear to have residual effects of the epileptic seizure rather than actual,

knowing resistance to the emergency treatment and transport in the ambulance. Although Jones'

medical condition certainly operated to restrain his movements and choices, a reasonable person

in this situation would not have felt subject to "inherently coercive pressures that tend[ed] to

undermine the individual's will to resist and to compel him to speak," *United States v. Morales*,

---

[6] However, with respect to the second statement made in the ambulance to a police officer to whom Reinert was "turned over" by the EMT after his first, apparently incriminating statement ("I stabbed him with a butcher knife . . . ."), the Third Circuit concluded that Reinert was in custody and that his pre-*Miranda* statement should not have been admitted. Due to the fact that the statement essentially duplicated other statements made after appropriate *Miranda* warnings were administered Reinert, the Third Circuit concluded that the error was harmless. *Reinert*, 379 F.3d at 79, 86-87.

834 F.2d 35, 38 (2d Cir.1987). Furthermore, the fact that the police considered Jones to have committed traffic violations at the time he was being transported to the hospital and were suspicious that drugs or alcohol may have been involved because of the bizarre nature of the accident, does not transform the situation into a custodial one. *See Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 ("[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect."). Looking at the record facts as summarized at the suppression hearing, it was not unreasonable for the state courts to determine that under the circumstances, a reasonable person in Jones' situation would not have felt himself to be in police custody–whatever the subjective opinions of the police officers might have been with respect to Petitioner's status as a suspect in the vehicular assault. *See Reinert v. Larkins*,  379 F.3d at  85-86 ("We do not believe that this standard is met by Reinert with respect to the statement made to the EMTs. Reinert was not in custody, nor was he a suspect in a crime when he entered the ambulance for the purpose of medical treatment and transport to the hospital. Although police officers accompanied Reinert in the ambulance, at that time officers had the limited knowledge that a body was found inside the house and that Reinert appeared to be wounded. Officers could have reasonably assumed that Reinert was a victim who could possibly identify a third person that may have been in the house."); *see also id.* at 86-87; *Wilson v. Coon*, 808 F.2d 688, 690 (8th Cir.1987) (finding that the defendant was not in custody when physically restrained by medical personnel at the scene of an accident because "[d]etention for a medical examination is not a situation that a reasonable person would find inherently coercive in the sense required by *Miranda*" ); *Gren v. Greiner*, 275 F. Supp.2d 313, 321 (E.D.N.Y. 2003), *aff'd*, 89 Fed. Appx.

754, 2004 WL 393093 (2d Cir. 2004) (unpublished opn.).

> **b.** **As to Petitioner's statements at the hospital when he was interviewed by police detectives**

As noted above, the Supreme Court has explained the "in custody" determination as follows: "Courts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting *Stansbury v. California*, 511 U.S. at 322, 325). With this framework in mind, the Court turns to the issue of whether Jones was subjected to custodial at the hospital by Officer Weader and Investigator Janus. After reviewing the record and pertinent case law, the Court does have concerns with regard to the statements made by Jones to the police while he still was at the hospital. At the time Jones spoke to Officer Weader, who tasked with determining whether Jones was intoxicated, Jones definitely was still a patient of the hospital. The Court recognizes that when Investigator Janus later spoke to Jones, Jones had been formally discharged from the hospital, although he had not left yet. Investigator Janus at that point asked Jones if he would speak with him, but he did not administer the *Miranda* warnings at that time. Jones voluntarily went with Investigator Janus to a small room used by the EMTs.  In this Court's opinion, it is a close question as to whether he was "in custody" when he was questioned at the hospital first by Officer Weader and later, after he was discharged but still at the hospital, by Investigator Janus.

I recognize that the Supreme Court has stated that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the *subjective* views harbored

by either the interrogating officers *or* the person being questioned." *Stansbury v. California*, 511 U.S. at 323 (emphases supplied). An officer's subjective beliefs are relevant only to the extent they would affect "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 324-35; *see also Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"; finding that being asked "a modest number of questions" by "a single police officer," was not, under the circumstances, "the functional equivalent of formal arrest").

"[C]ustody exists for *Miranda* purposes if a reasonable person in that position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Tankleff v. Senkowski*, 135 F.3d 235, 233 (2d cir. 1998) (quoting *Thompson v. Keohane*, 516 U.S. at 112, 116 S.Ct. at 465. A person can be "in custody" even when the suspect is questioned in his or her home. *See Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The Supreme Court's "cases establish that, even if the police do not tell a suspect he is under arrest, do not handcuff him, do not lock him in a cell, and do not threaten him, he may nonetheless reasonably believe he is not free to leave the place of questioning–and thus be in custody for *Miranda* purposes." *Yarborough v. Alvarado*, 541 U.S. 652, 675 (2004) (Breyer, J., dissenting) (citing *Stansbury*, 511 U.S. at 325-26; *Berkeme*r, 468 U.S. at 440. These obvious indicia of custody were not present in Jones' case. For instance, Jones admittedly was not handcuffed, locked in a cell, or threatened.

However, there may be other circumstances that would have led a reasonable person in Jones' position to believe he was not free to leave the place of questioning. The Supreme Court's decisions "also make clear that to determine how a suspect would have 'gaug[ed]' his 'freedom of movement,' a court must carefully examine 'all of the circumstances surrounding the interrogation,' *Stansbury*, [511 U.S.] at 322, 325 (internal quotation marks omitted), including, for example, how long the interrogation lasted (brief and routine or protracted?), *see, e.g.*, *Berkemer*, *supra*, at 441, 104 S.Ct. 3138; how the suspect came to be questioned (voluntarily or against his will?), *see, e.g.*, *Mathiason*, 429 U.S., at 495, 97 S.Ct. 711; where the questioning took place (at a police station or in public?), *see, e.g.*, *Berkemer*, *supra*, at 438-439, 104 S.Ct. 3138; and what the officer communicated to the individual during the interrogation (that he was a suspect? that he was under arrest? that he was free to leave at will?), *see, e.g.*, *Stansbury*, *supra*, at 325, 114 S.Ct. 1526." *Yarborough v. Alvarado,* 541 U.S. at 676 (Breyer, J., dissenting).

As to the location and duration of the questioning, Officer Weader was fairly brief and routine in his questioning, which was conducted in a public space (the hallway of the emergency room where Jones was lying on a gurney). However, there was a constant police presence near Jones while he was at the hospital; at least one officer was stationed several feet away from Jones' gurney at all times. Investigator Janus also conducted his initial questioning of Jones at the hospital. However, he did bring Jones into a small room (used by the EMTs as a "break room") and closed the door.

Granted, there was no "formal arrest or restraint on freedom of movement", although given the circumstances at the time that Jones questioned by Officer Weader, "it seems unlikely that [Petitioner] could or would have left the [hospital's] care, even if [police] had told him that

he was at liberty to do so." *Reinert v. Larkins*, 379 F.3d at 86. In this type of situation, an explanation that Petitioner was not required to answer questions "would have no doubt been more meaningful and more appropriate than a statement by the police that [Petitioner] was not under arrest." *Id.* However, such a statement, while helpful in determining the custodial nature of the interrogation, is not required to render an interrogation non-custodial. *Id.* Nevertheless, the absence of such a statement may be considered as a factor. *See Berkemer v. McCarty, supra*, at 438-439. With respect to the questioning by Officer Weader, I note that he did not tell Jones that he was not under arrest or that he did not have to answer any questions. Nor did Investigator Janus tell Jones that he was not under arrest, or that he was free to leave the hospital and under no obligation to stay and answer questions.

With respect to the issue of how Petitioner came to be questioned, I note that Officer Weader did not obtain Jones' express acquiescence to submit to questioning as to his possible drug or alcohol use. Jones did not, however, object to the interview. Later, when Investigator Janus approached Petitioner after he had been discharged, Petitioner voluntarily agreed to stay at the hospital and speak with the officer about the incident. Indeed, the state suppression court found that based upon the hearing testimony of the officers, Jones was anxious to cooperate with the police and answer their questions.

The real sticking point for this Court is the factor that looks at what the officers communicated to Petitioner individual during the interrogation about whether he was a suspect in a criminal investigation. First, on the ambulance ride to the hospital, Petitioner learned from Officer Feliciano that he had been involved in an accident with a police vehicle, and that the police were taking his car to the police impound lot. 8/21/00 at 28, 46-47. Later, at the hospital,

Officer Weader explained–in response to Petitioner's query about what had happened–that

Petitioner had struck both a police officer and a police vehicle with his car. 8/21/00 Tr. at 87-88.

Petitioner also was informed that the officer who had been hit had suffered severe injuries.

Arguably by the time Petitioner was questioned by Officer Weader, and certainly by the time

Investigator Janus entered the picture, this Court's opinion is that a "reasonable man in the

suspect's position would have understood his situation," *Berkemer v. McCarty*, 468 U.S. at 442,

as being a suspect in a criminal investigation regarding the vehicular assault of a police officer.

Once Investigator Janus began questioning Jones in the EMT breakroom at the hospital, after

Jones had been discharged, *see* 8/21/00 Tr. at 165-66, 208-15, Jones "had to know that he was a

suspect being questioned by a police officer[,]" *Reinert v. Larkins*, 379 F.3d at 87) ("The

statement made to Officer Zimmerman in the ambulance in response to his 'what happened'

question ('I think I killed him, I stabbed him.') is another matter. At that point [petitioner] had

made an incriminating statement, and when the EMT turned him over to Officer Zimmerman, he

had to know that he was a suspect being questioned by a police officer. Prior to starting his

question, Zimmerman should have, but failed to, read Reinert his *Miranda* rights.").

Accordingly, I believe that Investigator Janus should have read the *Miranda* warnings to Jones

before he commenced the interrogation at the hospital.

Even if I assume[7] that Jones made his initial inculpatory statements while in custody, and

in the absence of *Miranda* warnings, his subsequent inculpatory statements, which occurred after

---

[7]     *See also Parsad v. Greiner*, 337 F.3d 175, 182 (2d Cir. 3003) ("Thus, even given the deferential
AEDPA standard, the circumstances of petitioner's encounter with the officers raise questions concerning whether it
was custodial. As our disposition of this appeal does not require resolution of this issue, however, we will assume,
without deciding, that petitioner was in custody when he made his pre-*Miranda* statements.").

-47-

Investigator Janus advised him of the *Miranda* warnings, are not necessarily inadmissible as

"fruit" of the original *Miranda* violation. *Parsad v. Greiner*, 337 F.3d at 183 (citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)). The Supreme Court held in *Elstad* that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to subsequent statements that the suspect makes after receiving *Miranda* warnings. 470 U.S. at 314;[8] *accord Parsad*, 337 F.3d at 183.

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Elstad*, 470 U.S. at 314; *see also id.* at 311. Under these circumstances, the admissibility of any post-*Miranda* statement should instead turn "solely on whether it [was] knowingly and voluntarily made." *Id.* at 309; *accord Parsad*, 337 F.3d at 183. Accordingly, I "must consider whether the circumstances surrounding petitioner's unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby

---

[8]     In *Elstad*, a man suspected of burglary made an incriminating statement in his own home without having been Mirandized. He was taken to the police station, and after he was advised of and waived his *Miranda* rights, the suspect produced a written confession. In his subsequent prosecution for burglary, the state trial court excluded from evidence his first statement because he had not been given *Miranda* warnings, but admitted the written confession. Elstad was convicted, but the Oregon Court of Appeals reversed, holding that the confession should also have been excluded because of the brief period separating his initial, unconstitutionally obtained statement and his subsequent confession. In reversing the Oregon Court of Appeals, the United States Supreme Court explained that the failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. *See Elstad*, 470 U.S. at 304-11.

requiring the suppression of his post-*Miranda* confession." *Parsad*, 337 F.3d at 183 (citing

*Elstad*, 470 U.S. at 309-14). In determining the voluntariness of Jones' post-*Miranda* confession,

I must "examine the totality of the circumstances[,]" *id.* (citing *Tankleff*, 135 F.3d at 245),

"[s]pecifically, . . . 1) the accused's characteristics, 2) the conditions of the interrogation, and 3)

the conduct of the police[,]" *id.* (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d

Cir.1991)).

Although belated, the reading of Jones' *Miranda* rights was "undeniably complete."

*Elstad*, 470 U.S. at 314-15. Investigator Janus testified that he read the *Miranda* warnings aloud

from a printed card, recorded Jones' responses, and had Jones' sign the card. *Id.* Thus, there is no

question that Jones knowingly and voluntarily waived his right to remain silent before he spoke

to Investigator Janus at the Public Safety Building concerning the events surrounding the car

accident, including his epileptic condition and the warnings he had received about not driving.

This case does not present a situation where, arguably, no cure could be made because the police

created coercive circumstances, and other independent circumstances, such as Jones' medical

condition and medications, "tainted the investigatory process beyond repair." *Reinert*, 379 F.3d at

90. The uncontradicted testimony is that Jones was coherent, oriented, and articulate when he

spoke to the police at the hospital. Upon his discharge, the doctor confirmed that the medications

Jones received at the hospital that day would not affect his ability to function, since he had been

on them for such a long period of time and was acclimated to them. Jones never invoked his right

to remain silent, or said that he wanted to stop speaking with the police, or that he wanted an

attorney. *Cf. Parsad v. Greiner*, 337 F.3d at 184 ("[P]etitioner does not establish that the

detectives employed coercive or improper tactics during their interrogation. Petitioner argues that

the detectives ignored his initial statement that he did not wish to say anything concerning [the victim]'s death. The mere fact that police officers improperly question a suspect after he invokes his right to remain silent during a custodial interrogation does not render his subsequent statements the product of coercion."). Jones has made no contention that he was treated in a hostile or rude manner by the police. In sum, after examining the totality of the circumstances surrounding petitioner's interrogation, I do not think there is any suggestion that his statements to the police were involuntary.

When a subsequent confession is constitutionally obtained, federal courts have held that the admission of prior, unwarned, custodial confession is harmless error if the properly admitted, post-*Miranda* statement is cumulative of the pre-*Miranda* statements. *Reinert v. Larkins*, 379 F.3d at 87 (citing *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir.2001) (quoting *United States v. Johnson*, 816 F.2d 918, 923 (3d Cir.1987)); *Parsad v. Greiner*, 337 F.3d at 185 (citing *Campaneria v. Reid*, 891 F.2d at 1022). Here, Jones made "subsequent, constitutionally obtained, admissible statements that mirrored his earlier un-Mirandized statement," *Reinert*, 379 F.3d 87. Therefore, the admission of the pre-*Miranda* statements was harmless error, even under the most stringent constitutional error standard . . . of harmless beyond a reasonable doubt[,] *id.* (citing, *inter alia*, *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Parsad*, 337 F.3d at 185 n.5 (citations omitted).

### F. Admission of Testimony in Violation of Physician-Patient Privilege

The Appellate Division rejected this claim on direct appeal, holding, "We reject the further contention of defendant that reversal is required as a result of the admission of testimony of his treating physicians. Defendant expressly waived the physician-patient privilege when he

made admissions to police and executed consents on the date of the crime[.]" *People v. Jones*, 11

A.D.3d at 903 (citations omitted).

Section 4504 of the New York Civil Practice Law and Rules is New York State's

physician-patient privilege statute. *See* N.Y. CIV. P. LAW & R. 4504; *Hurd v. Stinson*, No. 99

CIV. 2426 LBS, 2000 WL 567014, *7 n.8 (S.D.N.Y. May 10, 2000).  "The relationship between

physician and patient is privileged by New York State law, but not by federal law." *Ballard v.*

*Fischer*,  No. 99 CV 0065(SJ), 2003 WL 23104173, *3 (E.D.N.Y. Dec. 16, 2003)). " Federal law

does not recognize the physician-patient privilege because this privilege did not exist at federal

common law." *Barnes v. Glennon*, 2006 WL 2811821, *4 (N.D.N.Y. Sept. 28, 2006) (*Lupowitz*

*v. Montefiore Med. Ctr.*, 1997 WL 4577, at *2 (S.D.N.Y. Jan. 6, 1997) (citing *Whalen v. Roe*,

429 U.S. at 602 n.28; *In re Doe*, 711 F.2d 1187, 1193 (2d Cir.1983) (further citation omitted))

*Manessis v. New York City Dep't of Transp.*, 2002 WL 31115032, at *2). It is well settled that

habeas corpus relief is unavailable when the complained of error is purely one of state law.

*Estelle v. McGuire*, 502 U.S. 62, 67 (1991). In general, and in Jones' case in particular, a state

trial court's rulings regarding the admissibility of evidence are a matter of state law.  Because

Jones' claim regarding the alleged violation of the physician-patient privilege raises only an issue

of state law, it cannot provide a basis for federal habeas relief. *Accord*, *e.g.*, *Hurd v. Stinson*,

2000 WL 567014, at *7 n.8 (rejecting habeas claim predicated on N.Y. CIV. P. LAW & R. § 4504

as "unavailing").

### G.   Trial Court's Evidentiary Error in Admitting Proof that Petitioner's License Had Been Suspended (Ground Seven)

Petitioner next contends that the trial court erred in allowing the jury to hear evidence that

Petitioner's driver's license had been suspended. It is true that the fact that a driver is unlicensed

fails to "demonstrate that he was negligent, as the absence or possession of a driver's license

relates only to the authority for operating a vehicle, and not to its manner of operation[.]"

*Almonte v. Marsha Operating Corp.*, 265 A.D.2d 357, 696 N.Y.S.2d 484, 485 (N.Y. App. Div.

1999) (citing *Hanley v. Albano,* 20 A.D.2d 644, 246 N.Y.S.2d 380 (N.Y. App. Div. 1964)).

However, as Respondent points out, with respect to two of the charges at issue (i.e., unlicensed

operation of a motor vehicle and aggravated unlicensed operation of a motor vehicle), "this proof

was the *sine qua non* of the charges." *People v. Pabon,* 167 Misc.2d 214, 217, 640 N.Y.S.2d

421, 423 (N.Y. Crim. Ct. 1995) ("To establish *prima facie* case of aggravated unlicensed

operation of motor vehicle in the second degree, the People are required to plead and prove the

following elements: defendant operated motor vehicle; defendant operated motor vehicle on

public highway; *defendant did so while knowing or having reason to know his license or*

*privilege of operating motor vehicle was suspended*, revoked, or otherwise withdrawn by

commissioner; and *defendant had, in effect, three or more suspensions* imposed on at least three

separate dates. McKinney's Vehicle and Traffic Law § 511, subd. 2(a)(iv)) (emphases supplied).

In general, where a petitioner merely challenges a state court's evidentiary rulings, this

Court cannot consider the petitioner's claims. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

("[I]t is not the province of a federal habeas court to reexamine state-court determinations on

state-law questions."); *Roberts v. Scully*, 875 F.S upp. 182, 189 (S.D.N.Y.1993) ("[R]ulings by

the state trial court on evidentiary questions are a matter of state law and pose no constitutional

issue ."), *report and recommendation adopted by* 875 F.Supp. 182 (S.D.N.Y.1995), *aff'd*, 71

F.3d 406 (2d Cir.1995). Even where a petitioner describes an evidentiary error as unduly

prejudicial, it must be recognized that "not all erroneous admissions of [unfairly prejudicial] evidence are errors of constitutional dimension." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998). "Indeed, to demonstrate that the admission of evidence by a state trial court constitutes a ground for federal habeas relief, a petitioner 'must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude.'" *Van Stuyvesant v. Conway*, 2007 WL 2584775, at *34 (S.D.N.Y. Sept. 7, 2007) (quoting *Copes v. Schriver*, No. 97 Civ. 2284(JGK), 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 22, 1997) (citation omitted).

In order for an evidentiary error to rise to the level of a constitutional violation warranting federal habeas relief, the petitioner has to show that the alleged error was so prejudicial that it deprived him of a "*fundamentally fair trial*." *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir.1988) (quoting *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983) (emphasis in original), *cert. denied*, 464 U.S. 1000 (1983)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985) ("We are not here simply being called upon to apply rules of evidence that might permit the state court in its discretion to grant a new trial but rather are dealing with a more fundamental constitutional concept of fairness."). For an "erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992)). In assessing materiality, the court must view the evidence "objectively in light of the entire record before the jury." *Collins*, 755 F.2d at 19.

Here, Jones has failed to meet his "heavy burden" of showing that any error of constitutional magnitude occurred, let alone that there was any error of New York state evidentiary law. In any event, even accepting Jones' argument that the evidence was erroneously admitted, the trial judge alleviated any potential prejudice by granting Petitioner's alternative request for a limiting instruction. T.437-38.[9]

### G. Improper Sentencing as a Second Violent Felony Offender (Ground Eight)

#### 1. The parties' arguments

Petitioner next contends that his due process rights were violated when he was sentenced as a second-felony offender because the trial court failed to hold a hearing when he attempted to challenge the constitutionality of a prior conviction used as a predicate felony in sentencing him for the convictions at issue in the instant habeas proceeding. Respondent argues that this allegation does not present a cognizable federal constitutional claim, and, in any event, it is meritless as a matter of state law.

As respondent points out, New York Criminal Procedure Law provides as follows:

Subsequent use of predicate felony conviction finding. Where a finding has been entered pursuant to this section, such finding shall be binding upon that defendant in any future proceeding in which the issue may arise.

N.Y. CRIM. PROC. LAW § 400.21(8); *accord* N.Y. CRIM. PROC. LAW §§ 400.15, 400.16, 400.20.

---

[9] Argument was held concerning the admissibility of documents relating to the vehicle and traffic violations. The trial court properly determined that evidence of Petitioner's license suspension was irrelevant to the issue of whether he recklessly operated his motor vehicle on January 18, 2000. T.440. *E.g.*, *White v. Molinari*, 160 A.D.2d 302, 303, 553 N.Y.S.2d 396 (N.Y. App. Div. 1990). The trial court granted the defense for a limiting instruction.

"According to C.P.L. §§ 400.21(7)(b), (8) 'unless good cause be shown for such failure to make timely challenge,' a defendant who waives a challenge to a previous conviction used as a predicate during a second felony offender hearing thereby waives the right to challenge its validity 'in any future proceeding in which the issue may arise.' *Lawlor v. Scully*, No. 93 Civ. 2985(JES), 1994 U.S. Dist. LEXIS 21366, *10 (S.D.N.Y. Mar. 1, 1994)." *Diaz v. Mantello*, 99 Civ. 12275, 2002 WL 2031615 at *3-4 (S.D.N.Y. Sept.4, 2002).[10]

Statutorily, New York defendant is not entitled to a hearing under C.P.L. § 400.20 where he claims that a prior conviction was unconstitutional on a ground that was previously decided against him in the normal course of review, or where the defendant waives the normal appellate review of that claim. *See*, *e.g., People v. DiGiacomo*, 96 A.D.2d 1127, 1128 (3d Dept. 1983) ("Defendant requested a hearing, pursuant to CPL 400.21 (subd 7, par [b]), to challenge the constitutionality of that conviction on the sole ground that it was obtained by means of an invalid identification procedure. Defendant, however, did not dispute that he had raised and litigated the identical issue regarding the validity of his identification during the course of the Erie County criminal proceeding and had unsuccessfully appealed from an adverse determination thereof to the Appellate Division. . . . [The] County Court, after being informed of and verifying the

---

[10] *See also Ennis v. Walker*, 00 Civ. 2875, 2001 WL 409530 at *18 (S.D.N.Y. Apr. 6, 2001) (state court could properly "rely on [petitioner's] 1989 adjudication as a second violent felony offender in adjudicating him a persistent violent felony offender and habeas relief is unavailable to [petitioner] on the basis that his current sentence was enhanced by his allegedly unconstitutional 1984 conviction."); *Phelps v. McLellan*, 95 Civ. 7868, 1998 WL 470511 at *1 (S.D.N.Y. Aug.11, 1998) ("because the judge involved in the 1985 Conviction determined that Petitioner had a predicate felony conviction by virtue of the 1981 Conviction, and because Petitioner did not contest the validity of the 1981 Conviction at the time of his sentencing in the 1985 Conviction, Petitioner is precluded from disputing the validity of the 1981 Conviction in the instant motion" arising from his 1988 conviction); *Lawlor v. Scully*, 93 Civ. 2985, 1996 WL 641635 at *4 (S.D.N.Y. Oct.22, 1996) (petitioner's claim that he was improperly adjudicated a persistent violent felony offender on basis of allegedly unconstitutional 1983 conviction barred from habeas review where, at 1984 sentencing, petitioner "accepted his designation as a second felony offender and expressly waived any attack on the validity of his 1983 felony conviction").

foregoing, denied defendant a hearing and sentenced defendant to the minimum sentence as a second felony offender. This appeal then ensued. Under the circumstances, it was not improper for County Court to have denied defendant a further hearing for the sole purpose of re-examining the very same factual and legal issues resolved against him after a suppression hearing in the Erie County case and affirmed on appeal."). Respondent argues that this type of waiver occurred in Jones' case. Specifically, Respondent argues, Jones waived his challenge to the constitutionality of his predicate conviction by expressly requesting that his appeal from that conviction he dismissed, which, upon the prosecution's motion, resulted in an order issued by the Appellate Division dismissing the appeal.

The background facts are somewhat convoluted. Prior to sentencing, the prosecution filed a second felony offender statement pursuant to C.P.L. § 400.21. Jones admitted that he was the person previously convicted the felony alleged therein, an assault committed in 1994 and for which conviction was obtained on May 19, 1995. Jones announced his intention to interpose a constitutional challenge to the prior conviction, and the trial court adjourned sentencing to allow defense counsel to prepare the requisite papers.

Shortly thereafter, sentencing counsel wrote to the trial court requesting assignment of new counsel because the constitutional challenge to the prior conviction would involve a claim of ineffective assistance of appellate counsel. The prosecutor opposed the motion.

Sentencing counsel (who was an assistant public defender) alleged that trial counsel in the 1995 case ("prior counsel") was also from the public defender's office.[11] Prior counsel filed a

---

[11]     Jones' sentencing counsel argued that there presently was a conflict of interest because  the putative, as yet unmade, challenge to the constitutionality of the 1995 conviction would involve an allegation that prior counsel, who was supposed to have been the public defender's office, failed to raise a meritorious argument on

-56-

notice of appeal, but the public defender's office was never appointed to perfect Jones' appeal; indeed, as the sentencing court noted, no appellate counsel was ever appointed for Jones in the 1995 case. Apparently, the appeal was dismissed upon the prosecution's motion in July 1997. Sentencing counsel acknowledged that Jones had written letters expressing a desire that the 1995 appeal be dismissed, but asserted that Jones really did not want that to occur. The prosecution's 1997 motion to dismiss did not reference these letters; however, at the sentencing hearing for the instant convictions, the prosecution submitted copies of correspondence from Jones sent to the district attorney's office after Jones was served with the motion to dismiss the appeal. Jones' letter, dated May 20, 1997, stated, "I would like for the court to dismiss the appeal." The prosecution also asserted that Jones sent letters in the same vein to the public defender's office and the Appellate Division. The Appellate Division granted the prosecution's motion and dismissed the appeal.

The sentencing court denied the motion to substitute new counsel on the basis of a conflict of interest. Although a defendant is entitled, as a matter of New York state procedural law, to a hearing when he challenges the constitutionality of a prior felony conviction, N.Y. Crim. Proc. Law § 400.21(5), the C.P.L. "does not grant any greater rights to challenge the constitutionality of a prior conviction than would be provided under C.P.L. § 440.10 or in a common law *coram nobis* proceeding." Sentencing Order of Monroe County Supreme Court dated January 29, 2001 ("Sentencing Order") at 3-4, Resp't Ex. A (citing *People v. DiGiacomo*, 96 A.D.2d 1127, 1128 (N.Y. App. Div. 1983). Therefore, the sentencing court declined to create a new judicial remedy and instructed that Jones' proper next step would be to challenge prior

appeal. In other words, sentencing counsel would have to argue the ineffectiveness of his own office.

-57-

appellate counsel's ineffectiveness in *coram nobis* proceeding. If the Appellate Division sustained Jones' ineffectiveness claim and concluded that he was not a second felony offender, the sentencing court explained, the matter would be remitted for resentencing. *Id.* at 4. In the meantime, the court sentenced Jones as a second felony offender based upon the information it had before it, without prejudice to a collateral proceeding claiming ineffective assistance of appellate counsel as described above. *Id.* at 5. It does not appear that Jones followed up on this option and so the predicate felony used to establish his second felony offender status still stands.

Based upon the above precedent and factual circumstances, it does not appear to this Court that Jones has established that there was an error of New York state law in connection with his predicate sentencing proceeding, let alone an error of federal constitutional magnitude. Indeed, it seems to this Court that the sentencing court handled the issue in a fair and balanced manner.

Other habeas courts in this Circuit have rejected similar claims, finding that a petitioner's challenge to his adjudication as a second violent felony offender is foreclosed by "New York's rule that once a defendant has been found to be a predicate felon, that finding is binding in the future[.]" *Dickens v. Filion*, No. 02 Civ. 3450(DLC)(AJP), 2002 WL 31477701, at *20 (S.D.N.Y. Nov. 6, 2002). Courts in this Circuit have upheld this rule "which really is just a specific application of the collateral estoppel doctrine," to deny habeas claims similar to that alleged by Jones here. *Id.* (citing cases); *see also United States ex rel. Kenny v. Follette*, 410 F.2d 1276, 1278-79 (2d Cir. 1969) ("State prisoner seeking federal habeas corpus relief waived right to challenge voluntariness of his prior guilty plea which was predicate for his multiple offender treatment on his second conviction in New York state court, where (1) he made no attempt to

withdraw prior plea although trial judge would have granted request if it had been made, (2) he failed to appeal prior conviction although his lawyer advised him to do so, (3) he withdrew first application for federal habeas corpus relief after hearing had been ordered, and (4) at his sentencing for second offense he was told that he could challenge validity of prior conviction as predicate for multiple offender treatment and he failed to do so.").

For the foregoing reasons, Jones' claim of a due process error in his sentencing proceeding is dismissed.

## I.      Ineffective Assistance of Trial Counsel

Petitioner asserts that his attorney afforded him ineffective assistance at trial. Ineffective assistance of counsel claims must be analyzed under the two-pronged standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. Second, if petitioner makes such a showing, petitioner must demonstrate that, but for counsel's error, there is a reasonable probability that the result would have been different. *Id.* at 694. When reviewing that performance, a federal court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 689.

Petitioner contends that his trial counsel was ineffective because he failed to preserve by objection the allegedly improper remark of the prosecutor during *voir dire*. Walker is unable to establish prejudice based on counsel's failure to object to the prosecutor's remarks. First of all, even if counsel had objected to the comments, Jones' challenge would have proven fruitless on appeal. *See Flores v. Keane*, 211 F.Supp.2d 426, 435 (S.D.N.Y.2001) (counsel failed to preserve

objection to prosecutor's comments; petitioner unable to establish prejudice to excuse procedural default where state court held that if it were to consider claim, it would find it unmeritorious).

Here, despite the lack of a contemporaneous objection, the Appellate Division considered the issue on the merits and concluded that it was without merit. *Jones,* 11 A.D.3d at 903. Second, as discussed above in this Decision and Order, the district attorney's remark did not amount to prosecutorial misconduct. At any rate, even if the Court were to assume impropriety, the one comment during *voir dire* did not infect the entire proceeding with unfairness, and therefore did not substantially prejudice Jones. Because Jones cannot demonstrate that he suffered actual prejudice as a result of counsel's omission, his ineffective assistance claim necessarily fails. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Petitioner argued that trial counsel was ineffective for not seeking severance  so as to be permitted to try the vehicle and traffic law offenses separately from the assault charge. Respondent asserts that severance would not have been available under New York State law because these charges all were part of the same criminal transaction, and therefore the prosecution was entitled to join them in one indictment under C.P.L. § 200.20(2)(a). Discretionary severance is statutorily available, but only where the charges involve "different criminal transactions." N.Y. CRIM. PROC. LAW § 200.20(3). Thus, even if trial counsel had moved to sever, it appears that the trial court could not, and would not have been able to, grant the motion under New York law. Jones therefore cannot demonstrate the requisite prejudice as a result of counsel's failure to seek severance, which was not professionally unreasonable under the circumstances here. *See*, *e.g.*, *United States v. Arena*, 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), *cert. denied*,

531 U.S. 811, 121 S.Ct. 33 (2000); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir.) (same), *cert. denied*, 516 U.S. 927, 116 S.Ct. 330 (1995); However, as Respondent points out, New York law does not provide a basis for such a motion where, as here, the charges all stem from the same criminal transaction. *See* N.Y. CRIM. PROC. LAW § 200.20 (3).

Accordingly, there is no reasonable possibility that any such motion would have been successful, and Jones cannot demonstrate how he was prejudiced by counsel's decision not to pursue a meritless application. As Respondent points out, trial counsel sought by other means to ameliorate the prejudice he believed would accrue from trial of all the charges together; for instance, he attempted to preclude introduction of evidence concerning the suspension, prior to the incident, of Petitioner's driver's license.

Petitioner also argues that trial counsel was ineffective in failing use up all of his peremptory challenges in order to preserve the issue concerning the challenge of a juror for cause. However, courts in New York have held that a contention that defense counsel was ineffective for failing to challenge a prospective juror for cause or to exercise a peremptory challenge with respect to that prospective juror does not by itself constitute ineffective assistance. *E.g.*, *People v. Turck*, 305 A.D.2d 1072 (App. Div. 4th Dept. 2003), *lv. denied,* 100 N.Y.2d 566. As a tactical matter, trial counsel may decide not to use all of his peremptory challenges if he believes that the jurors seated are as fair and favorable to his client's cause as he reasonably could expect. To the extent that this argument boils down to a disagreement with trial strategy, it is well-settled that mere disagreement with strategic matters does not support a claim for constitutionally ineffective assistance. *See Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir.1983) (habeas court should not "second guess matters of trial strategy simply because the

chosen strategy was not effective").

Finally, Jones has not offered a basis for arguing that his trial counsel was ineffective in connection with the second felony offender hearing. As discussed above, trial counsel attempted to convince the sentencing court that it should hold that Petitioner's previous second degree assault conviction should not be counted as a predicate felony based upon an alleged constitutional infirmity (i.e., ineffective assistance of prior appellate counsel). Although trial counsel was unsuccessful in getting the trial court to grant the requested relief, he did obtain a ruling that the second felony adjudication was without prejudice so that Petitioner could pursue his attack on the previous conviction in another forum. And, even assuming for the sake of argument that Jones' prior appellate counsel may have been ineffective for failing to perfect that earlier appeal, Petitioner's trial counsel in this matter certainly cannot be faulted.

**K.     Sentencing Claims**

**1.     "Harsh and Excessive" Sentence**

Jones contends that the imposed by the court on the conviction of assault in the first degree (a determinate term of incarceration of 18 years) is harsh and excessive. On his direct appeal, Petitioner claimed that his sentence was excessive in light of his expressions of remorse for his conduct and his community and family support, and urged the Appellate Division to reduce the sentence under C.P.L. §§ 470.15(2)(c), 470.15(6)(b), which gives the state court broad plenary power to modify a sentence that is unduly harsh or severe, though legal. The Appellate Division, after exercising its factual review power and examining this claim on direct appeal, concluded that the sentence was "not unduly harsh or severe."

Where, as here, a defendant's sentence is within the statutory range provided for by New

York law, courts in this Circuit have held that it does not present a constitutional claim amenable to review in a federal habeas corpus. *See*, *e.g.*, *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the [habeas petitioner's] sentence is within the range prescribed by state law.") (citing Underwood v. Kelly, 692 F.Supp. 146 (E.D.N.Y.1988), *aff'd mem.*, 875 F.2d 857 (2d Cir.1989). A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977) (petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."). If Jones had not been adjudicated as a second felony offender, he faced a minimum of five years and a maximum of 25 years in prison for a conviction of assault in the first degree (N.Y. PENAL LAW § 120.10(3). *See* N.Y. PENAL LAW § 70.02 (3)(a). Assault in the first degree as defined in N.Y. Penal Law § 120.10 is a class B violent felony offense. N.Y. PENAL LAW § 70.02(1)(a). "[T]he sentence imposed upon a person who stands convicted of a class B or class C violent felony offense must be a determinate sentence of imprisonment which shall be in whole or half years. The term of such sentence must be in accordance with the provisions of subdivision three of this section [i.e., Penal Law § 70.02]." N.Y. PENAL LAW § 70.02(2)(a) (effective until Sept. 1, 2011, pursuant to L.1995, c. 3, § 74, par. d). Section 70.02(3) provides that "the term of a determinate sentence . . . (a) [f]or a class B felony, . . . must be at least five years and must not exceed twenty-five years . .

. .” N.Y. Penal Law § 70.02(3)(a). Jones' determinate sentence of eighteen (18) years falls within the limits set by the relevant state statutes. Accordingly, the claim that it is unduly harsh and excessive does not present a constitutional question for this Court to decide. *E.g.*, *Hamilton v. Hook*, 806 F. Supp. 429, 434 (S.D.N.Y. 1992); *Chisolm v. Henderson*, 736 F. Supp. 444, 447 (E.D.N.Y. 1990); *aff'd*, 953 F.2d 635 (2d Cir. 1991); *Castro v. Sullivan*, 662 F. Supp. 745, 753 (S.D.N.Y. 1987) ("In the instant case, the state trial judge imposed the maximum sentence authorized under the applicable state criminal statutes of 25 years to life. Petitioner argues that this sentence is excessive, given his lack of a prior criminal record and his relatively youthful age of 22 at the time of his conviction. However, because the sentence, determined after petitioner's conviction . . ., falls within the limits set by the relevant state statutes, this Court lacks any basis for questioning its validity.").

### 2.      Vindictive Sentencing

On direct appeal, appellate counsel asserted that Jones' was vindictively sentenced because he rejected a plea offer and exercised his right to a jury trial. To the extent that Jones' fleeting reference in his appellate brief to the impropriety of punishing a defendant for exercising a constitutional right could be construed as a claim of judicial vindictiveness for Petitioner's exercise of his right to proceed to trial, Petitioner has not established a basis to overturn his sentence.

Here, the prosecution offered Jones the opportunity to plea to the top count of the indictment (first degree assault), with a sentence recommendation of 10 years, determinate, as a second violent felony offender. 7/7/00 Tr. at 2-3. Jones requested additional time to discuss the matter with some of his relatives who had just arrived from out of town. *Id.* at 4-5. The hearing

was adjourned until two weeks later, at which time Jones was given an additional hour to consult with his attorney, whose "recommendation . . . [was] that he strongly consider the [plea] offer." 7/14/00 Tr. at 7. However, Jones informed the court, "I reject [the plea offer], sir." *Id.* at 6. The prosecutor indicated that his office would "not go along with a minimum sentence again." *Id.* at 6-7.

At the sentencing hearing, Jones was given the opportunity to speak for about 40 minutes concerning how remorseful he was, that he was "asking for forgiveness, knowing [he is] innocent." Sentencing Transcript ("Sent. Tr.") at 26. Jones claimed that the accident was a result of the doctors over-medicating him when he had the previous seizure. *Id.* at 23-24. Jones repeatedly insisted that he "never meant to purposely injure" Officer McLaughlin. *E.g.*, *id.* at 21.

The sentencing judge noted that much of what Jones had said "reveals the rather stark fact that you haven't come to grips with the gravity of what you did." *Id.* at 27. The judge explained that the crime of depraved indifference and intentional assault were equally blameworthy under the law. He commented that he had read all of the positive letters received on Petitioner's behalf, and he attempted to dispel the notion that Petitioner was receiving disparate treatment because he was black and the victim was a police officer. The judge then imposed sentence. *Id.* at 28-29.

A sentence is unconstitutionally vindictive if it imposes greater punishment because the defendant exercised a constitutional right, such as the right to jury trial or the right to appeal. *Wasman v. United States*, 468 U.S. 559, 568, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984) (citing, *inter alia*, *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656). *Pearce* held that the Due Process Clause of the Fourteenth Amendment "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play

no part in the sentence he receives after a new trial." *Accord, e.g.*, *Bordenkircher v. Hayes*, 434

U.S. 357, 362 (1978).  The Supreme Court in *Alabama v. Smith,* 490 U.S. 794 (1989),

summarized its precedents on this issue:

> "In order to assure the absence of such a motivation [of vindictiveness], we have
> concluded that whenever a judge imposes a more severe sentence upon a
> defendant after a new trial, the reasons for him doing so must affirmatively
> appear." [*Pearce*, 395 U.S.] at 726, 89 S.Ct., at 2081. Otherwise, a presumption
> arises that a greater sentence has been imposed for a vindictive purpose-a
> presumption that must be rebutted by " 'objective information . . . justifying the
> increased sentence.' " *Texas v. McCullough*, 475 U.S. 134, 142, 106 S.Ct. 976,
> 981, 89 L.Ed.2d 104 (1986) (quoting *United States v. Goodwin*, 457 U.S. 368,
> 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982)).

*Smith*, 490 U.S. at 799. *Accord*, *e.g.*, *Correia v. Hall*, 364 F.3d 385, 388 (1ˢᵗ Cir. 2004) ("In the

event a criminal defendant successfully appeals his conviction and the same trial judge imposes a

stiffer sentence following a retrial, the presumption arises that the harsher sentence was a product

of judicial vindictiveness in response to the defendant's rightful recourse to the appellate process;

yet this presumption is rebuttable provided the record contains objective evidence which

adequately explains the more severe sentence.") (citations omitted).

"The same [*Pearce*] presumption may arise when a criminal defendant rejects a plea

agreement–and with it the prospect of a more lenient sentence–and elects instead to exercise his

constitutional right to a jury trial." *Correia v. Hall*, 364 F.3d at 388 (citing *Johnson v. Vose*, 927

F.2d 10, 11 (1ˢᵗ Cir. 1991) (citing *United States v. Crocker*, 788 F.2d 802 (1ˢᵗ Cir.1986); *Longval*

*v. Meachum*, 693 F.2d 236 (1ˢᵗ Cir. 1982)). " '[T]he evil the [*Pearce*] Court sought to prevent' "

was not the imposition of 'enlarged sentences after a new trial' but 'vindictiveness of a

sentencing judge.' " *Id.* (quoting *McCullough*, 475 U.S. at 142 and citing *Chaffin v. Stynchcombe*,

412 U.S. 17, 25, 93 S.Ct. 1977, 1982, 36 L.Ed.2d 714 (1973) (holding that the *Pearce*

presumption was not designed to prevent the imposition of an increased sentence on retrial "for some valid reason associated with the need for flexibility and discretion in the sentencing process," but was "premised on the apparent need to guard against vindictiveness in the resentencing process").

The Supreme Court has restricted application of the *Pearce* presumption to those situations in which there is a "'reasonable likelihood,' *United States v. Goodwin*, 457 U.S., at 373, that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Alabama v. Smith,* 490 U.S. 794. Absent a "reasonable likelihood" of "actual vindictiveness," "the burden remains upon the defendant to prove actual vindictiveness[.]" *Alabama v. Smith*, 490 U.S. 794 (citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)).

On the present record, invocation of the *Pearce* presumption is unwarranted. *See Correia v. Hall*, 364 F.3d at 388-89 ("First, the mere fact that the post-verdict sentence exceeded the 'plea bargain' sentence by some seven to ten years is insufficient, in and of itself, to indicate a reasonable likelihood of actual vindictiveness. For one thing, unlike a verdict of guilty, an admission of guilt properly warrants the sentencing court's consideration of a more lenient sentence than might otherwise be imposed in appropriate response to the defendant's criminal conduct. *See Smith*, 490 U.S. at 802, 109 S.Ct. 2201. Thus, the five-to-seven year prison sentence proffered to Correia during the plea bargaining process does not reflect a true assessment of Correia's criminal culpability, in that it plainly included a substantial discount for leniency. As for the remaining aspect of the differential, normally the sentencing court imposes a post-verdict sentence after considering the evidence presented at trial. In contrast, a plea-bargained sentence

normally is predicated upon a more rudimentary record of the alleged criminal conduct, such as the description in the indictment, and/or a presentence report.").

Since the *Pearce* presumption has no application here, Jones bears the burden of showing "actual vindictiveness" on the part of the sentencing judge. Besides the disparity between the sentence offered in connection with the plea and the sentence imposed after Jones' trial, Jones has not pointed to anything in the record, such as comments by the judge or other circumstances surrounding the sentencing, that would establish "actual vindictiveness". *Cf. Pearce*, 395 U.S. at 723, 89 S.Ct. 2072 ("A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.'") (citation omitted); *accord Correia*, 364 F.3d at 390.

Habeas relief accordingly is not warranted here. *See Moore v. Chrones*, No. CV 03-9543-PSG (MAN), 2010 WL 291774, at *37 (C.D.Cal. Jan. 14, 2010) ("Petitioner has not alleged any circumstances, much less adduced any evidence, indicating or giving rise to an inference that the trial court's imposition of a Three Strikes [recidivist] sentence was vindictive and imposed as punishment for Petitioner's failure to accept a plea offer. The Court has read the record very carefully and concludes that only the opposite conclusion ( i.e., a lack of vindictiveness) can be drawn.").

**IV.     Conclusion**

For the reasons set forth above, Edward Jones' request for a writ of habeas corpus is denied and the petition is dismissed. I decline to issue a certificate of appealability as Jones has

not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2);

see Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     May 13, 2010
           Buffalo, New York.